The State of Ohio, Appellee, *v.* Whisner ██ et al.,
Appellants.

[Cite as State v. Whisner (1976), 47 Ohio St. 2d 181.]

182

(No. 75-746—Decided July 28, 1976.)

188

196

*Mr. Lee E. Fry,* prosecuting attorney, *Messrs. Spidel, Staley, Hole & Hanes* and *Mr. Hugh A. Staley,* for appellee.

*Messrs. Ball & Skelly, Mr. William Bentley Ball, Mr. Joseph G. Skelly, Messrs. Miller, Schlemmer & Weisbrod* and *Mr. Robert N. Schlemmer,* for appellants.

CELEBREZZE, J. This cause presents sensitive issues of paramount importance involving the power of the state to impose extensive regulations upon the structure and government of non-public education, and, conversely, upon the right of these appellants to freely exercise their professed religious beliefs in the context of providing an education to their children. Because both the Court of Appeals and the Court of Common Pleas fundamentally misconstrued the principles of law applicable to resolution of the instant cause, and because the issues presented herein are apparently questions of first impression in Ohio, a thorough examination of the relevant decisional law, as expressed by the Supreme Court of the United States, and of the applicable constitutional and statutory provisions, both federal and state, is required.

At the outset, we recognize that appellants do not facially attack the compulsory school attendance laws of this state as set forth, generally, in R, C. Chapter 3321. We need not now reexamine, therefore, the decision in *Parr* v. *State* (1927), 117 Ohio St. 23, upholding the constitutionality of compulsory school attendance in this state.

Nor do the appellants maintain that the state is devoid of all power to promulgate and enforce *reasonable* regulations affecting the operation of non-public schools. Numerous decisions of the Supreme Court of the United States over the years have clearly sounded the death knell with respect to any such assertion.

In *Board of Edn.* v. *Allen* (1968), 392 U. S. 236, 245, the court stated: "* * * a substantial body of case law has confirmed the power of the states to insist that attendance at private schools, if it is to satisfy state compulsory-attendance laws, be at institutions which provide minimum hours of instruction, employ teachers of specified training, and cover prescribed subjects of instruction * * * [and that] if the state must satisfy its interest in secular education through the instrument of private schools, it has a proper interest in the manner in which those schools perform their secular educational function." (Footnote omitted.)

More recently, in *Wisconsin* v. *Yoder* (1972), 406 U. S.

**198**

205, 213, the court clearly elucidated the relevant law, as follows: "There is no doubt as to the power of a state, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education." See, also, *Lemon* v. *Kurtzman* (1971), 403 U. S. 602; *Pierce* v. *Society of Sisters* (1925), 268 U. S. 510; and *Meyer* v. *Nebraska* (1923), 262 U. S. 390.

Appellants do contend, however, that application of Ohio's compulsory attendance laws as to them, through the medium of the Minimum Standards for Ohio Elementary Schools, prescribed by the State Board of Education pursuant to the express legislative command contained in R. C. 3321.03, infringes upon their free exercise of religion as guaranteed by the First[1] and Fourteenth[2] Amendments to the Constitution of the United States, and by Section 7, Article I[3] of the Ohio Constitution.

With regard to appellants' assertion that the state's "minimum standards," as applied to them, unconstitutionally interfere with their right to freely exercise their professed religious beliefs, both the Court of Appeals and

---

[1] The First Amendment provides, in pertinent part, that:

"Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof * * *."

[2] The Fourteenth Amendment, provides in pertinent part: "* * * No state shall * * * deprive any person of life, liberty, or property, without due process of law * * *."

[3] Section 7, Article I of the Ohio Constitution provides, in pertinent part:

"All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience. No person shall be compelled to attend, erect, or support any place of worship, or maintain any form of worship, against his consent; and no preference shall be given, by law, to any religious society; nor shall any interference with the rights of conscience be permitted. * * * Religion morality, and knowledge, however, being essential to good government, it shall be the duty of the General Assembly to pass suitable laws, to protect every religious denomination in the peaceable enjoyment of its own mode of public worship, and to encourage schools and the means of instruction."

the Court of Common Pleas committed error in failing to accord the requisite judicial deference to the veracity of those beliefs. Indeed, both courts *questioned* whether appellants' beliefs were founded upon religious principles, with the Court of Common Pleas labelling appellants' religious beliefs "an afterthought," while the Court of Appeals simply concluded that "the testimony of Rev. Whisner * * * however well meant, is inadequate to justify on religious grounds a complete departure from the minimum standards of the state Department of Education * * * [because] his testimony reflects the subjective attitudes of the members of his congregation, and his reasoning is based essentially upon a subjective interpretation of Biblical language."

However, at this date and time in the history of our nation, it is crystal clear that neither the validity of what a person believes nor the reasons for so believing may be contested by an arm of the government. As stated in *United States* v. *Ballard* (1944), 322 U. S. 78, 86: "Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others." The applicable test was enunciated in *United States* v. *Seeger* (1965), 380 U. S. 163, 185, in these words: "* * * that while the 'truth' of a belief is not open to question, there remains the significant question whether it is 'truly held.' This is the threshold question of sincerity which must be resolved in every case. It is, of course, a question of fact * * *."

Based upon the extensive record before us, there can be no doubt that appellants' religious beliefs are "truly held." Rev. Whisner's testimony clearly reveals that the religion in which he believes is a historical religion consisting of "born-again" Christians, who adhere to a life of separation from worldliness, and who strictly structure their lives upon a subjective interpretation of Biblical language. The uncontradicted testimony of Rev. Whisner, and that of the other defense witnesses, as documented in

the foregoing statement of the case, conclusively establishes that these appellants are God-fearing people with an abiding religious conviction that Biblical training is essential to the proper inculcation of spiritual and moral values into their youth at a time when such precepts are most likely to take root—during the formative years of educational growth and physical development. In this regard, appellants' testimony unmistakenly emphasizes their collective dissatisfaction with the form of the education provided by the public schools of this state, and their total religious compulsion that their offspring be educated in the word of God according to their religious scruples. Moreover, the sincerity of appellants' religious beliefs can best be illustrated by the very fact that they were willing to subject themselves to the criminal process of this state in order to vindicate their position. No more need be said concerning the sincerity of appellants' religious beliefs, for, in our view, it has been established beyond peradventure.

However, the fact that appellants' religious beliefs are "truly held" does not end, but rather serves only to begin, our inquiry. In *Abington School District* v. *Schempp* (1963), 374 U. S. 203, 223, the court stated that the purpose of the free exercise clause of the First Amendment "is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority. Hence it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion." This format, in which claims of infringement upon the free exercise of religion are to be analyzed, was expressly affirmed in *Board of Edn.* v. *Allen, supra* (392 U. S., at page 249), and impliedly recognized in *Wisconsin* v. *Yoder, supra* (406 U. S., at page 235).

In the instant cause, therefore, it was incumbent upon appellants to demonstrate the manner in which the state's "minimum standards" infringed upon their free exercise of religious liberty.

201

Through the testimony of Rev. Whisner, appellants voiced religious objections to four of the state's denominated "minimum standards." Those standards, and appellants' objections thereto, are set forth herein as follows:

1. EDb-401-02(E)(6)—"A charter shall be granted after an inspection which determines that all standards have been met." (Appellants do not desire a charter, because acceptance of same would constitute their agreement to comply with all standards, and thereby effectively remove their ability to control the direction of the school by reposing vast powers in the hands of the state.)

2. EDb-401-02(G)—"Based on a minimum five-hour school day or one of greater length, the total instructional time allocation per week shall be:

"four-fifths—language arts, mathematics, social studies, science, health, citizenship, related directed study and self-help; optional foreign language.

"one-fifth—directed physical education, music, art, special activities and optional applied arts." (Appellants complain that this standard does not expressly allot time in which Biblical and spiritual training may be given, and, therefore, is inimicable to the fundamental purpose of a religious school in that it severely restricts the ability of the school to incorporate its religious teachings.)

3. EDb-401-02(O)—"* * * All activities shall conform to policies adopted by the board of education." (The contention is advanced by appellants that this standard virtually provides a blank check to the public authorities to control the entire operation of their school.)

4. EDb-401-07—"Efforts toward providing quality education by the school for the community it serves shall be achieved through cooperation and interaction between the school and the community. The understanding of the roles of each and a flow of information are basic to this relationship.

"(A) The elementary principal and staff in keeping with administrative or board of education policies shall provide evidence, through written materials and informa-

tional meetings, of a continuous effort to give professional interpretation of the school's policies, program, purposes, planning, strengths and needs.

"(B) Each elementary school shall demonstrate, through school-community activities, evidence of cooperative assessment of community needs to determine the purposes, program and planning for future educational improvement." (Appellants maintain that a Christian school cannot seek its direction from the world or from the community it serves.)

In addition, appellants objected, upon religious grounds, to the following statements appearing in the "Interpretative and Explanatory Information" section of the publication containing the "minimum standards":

1. EDb-401-02(J)—"When a pupil transfers, within a school system or moves to a school outside of the school system, pertinent pupil information is forwarded to the principal of the receiving school. Office records of this nature are not released to parents and guardians.

"A standardized format for the transcript information is developed for use in the school system. Items make reference to: the level of school assignment, personal data, health information, standardized test results, academic progress, and attendance. Confidential child study information is not necessarily included for release." (Appellants contend that it is very important for a parent to be appraised of everything occurring in school relating to his or her child or children.)

2. EDb-401-03(B) (page 30 of the publication)—"1. Common problems are solved through the consensus of thinking and action of individuals in the group.

"2. Individuals have a responsibility of authentic citizenship as a member of the school, community, state, nation and world.

"3. Citizens have a responsibility for the welfare of others and for being willing to sacrifice for the common good." (Appellants reject the idea that common problems are solved solely by the group, because they instead ad-

here to the belief that problems are solved by the group on their knees. In addition, appellants contend that these comments reflect a philosophy of "secular humanism" on the part of the state—a philosophy to which appellants cannot, consistent with their religious beliefs, ascribe.)

3. EDb-401-03(B) (page 48)—"Organized group life of all types 'must act in accordance with established rules of social relationships and a system of social controls." (Appellants again object to the "humanism" philosophy allegedly espoused herein.)

4. EDb-401-03(B) (page 60)—"The health of the child is perhaps the greatest single factor in the development of a well-rounded personality. No individual is adequately prepared for effective living unless he has a well-functioning body and can make reasonably successful adjustments to his many problems. Both are essential for facilitating learning, promoting personal efficiency, and developing successful social and family living. For these reasons health education is considered an integral part of the total education program. Its place in the curriculum becomes increasingly important as automation, population growth, changing moral standards and values, mounting pressures, and other changes in our society create new or intensify existing health problems." (Appellants contend that although man's standards may change with respect to moral values, God's does not.)

In examining the foregoing "minimum standards," we are mindful of the admonition of Judge Alphonso Taft, father of the former Chief Justice of the Supreme Court of the United States, in an unreported dissenting opinion he authored over 100 years ago, which was quoted with approval by the Supreme Court in *Abington School District* v. *Schempp, supra* (374 U. S. 203, 215), that with respect to religious freedom "[t]he government is [must be] neutral, and while protecting all, it prefers none, and it disparages none."

Our review of the particular "minimum standards" objected to by appellants discloses that the language utili-

204

zed in those standards is facially neutral. Although appellants argue that no reference is made in those standards to God or to Biblical instruction, we think it plain that to do so would constitute a violation of the establishment clause of the First Amendment. See, e. g., *Abington School District* v. *Schempp, supra; Everson* v. *Board of Edn.* (1947), 330 U. S. 1; *Cantwell* v. *Connecticut* (1940), 310 U. S. 296.

However, as required by *Wisconsin* v. *Yoder, supra* (406 U. S. 205), at page 220, we must also determine whether "[a] regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality * * * [because] it unduly burdens the free exercise of religion." See, also, *Sherbert* v. *Verner* (1963), 374 U. S. 398, 404; *Braunfeld* v. *Brown* (1961), 366 U. S. 599, 607.

In this regard, we must conclude that the compendium of "minimum standards" promulgated by the State Board of Education, taken as a whole, "unduly burdens the free exercise of [appellants'] religion." *Wisconsin* v. *Yoder, supra.*

To begin with, although admittedly an admirable effort to extol the secular aims of the state in assuring that each child educated in this state obtains a quality education, we believe that these "minimum standards" overstep the boundary of *reasonable* regulation as applied to a nonpublic religious school.

It must be remembered that one of the "minimum standards" requires compliance with all such standards before a charter can be granted. See EDb-401-02(E)(6). This is so despite the fact that the statutes upon which the "minimum standards" are based, R. C. 3301.07[*] and 3301.-

---

[*]R. C. 3301.07 provided, in pertinent part, at the time of the trial in this cause:

"The State Board of Education shall exercise under the acts of the legislature general supervision of the system of public education in the state of Ohio. In addition to the powers otherwise imposed on the state board under the provisions of law, such board shall have the following powers:

16,[5] do not expressly require such absolute compliance.

Moreover, certain of the "minimum standards" at least indirectly hamper the right of appellants to freely exercise their religious beliefs through the medium of the educational institution they have established expressly for that purpose.

"* * *

"(D) It shall formulate and prescribe minimum standards to be applied to all elementary and high schools in this state for the purpose of requiring a general education of high quality. Such standards shall provide *adequately for*: a curriculum sufficient to meet the needs of pupils in every community; the certification of teachers, administrators and other professional personnel and their assignment according to training and qualifications; efficient and effective instructional materials and equipment, including library facilities; the proper organization, administration and supervision of each school, including regulations for preparing all necessary records and reports and the preparation of a statement of policies and objectives for each school; buildings, grounds, health and sanitary facilities and services; admission of pupils, and such requirements for their promotion from grade to grade as will assure that they are capable and prepared for the level of study to which they are certified; requirements for graduation; and such other factors as the board finds necessary.

"*In the formulation and administration of such standards for non-tax supported schools the board shall also consider the particular needs, methods and objectives of said schools,* provided they do not conflict with the provision of a general education of a high quality and provided that regular procedures shall be followed for promotion from grade to grade of pupils who have met the educational requirements prescribed.

"* * *." (Emphasis added.)

The amended version of R. C. 3301.07, effective August 29, 1975, contains substantially the same language as that quoted herein.

[5]R. C. 3301.16 provides, in pertinent part:

"Pursuant to standards prescribed by the State Board of Education as provided in division (D) of Section 3301.07 of the Revised Code, such board shall classify and charter school districts and individual schools within each district. Such board shall revoke the charter of any school district or school which fails to meet the standards for elementary and high schools as prescribed by the board. In the issuance and revocation of school district or school charters, the State Board of Education shall be governed by the provisions of Chapter 119 of the Revised Code. * * *"

We refer, first, to EDb-401-02(G), which allocates instructional time in the comprehensive curriculum required by R. C. 3313.60,[6] almost to the minute. Since R. C. 3313.48[7] requires a minimum school day of five hours, the requirement of EDb-401-02(G) invariably results in further control of the educational policies of a non-public religious school in a manner that we cannot say is compelled by the enabling legislation pursuant to which the "minimum standards" were adopted.[8] R. C. 3313.48 and 3313.60, although

[6]R. C. 3313.60 provided, in pertinent part, at the time of the trial in this cause:

"Boards of education of county, exempted village, and city school districts shall prescribe a graded course of study for all schools under their control subject to the approval of the State Board of Education. In such graded courses of study there shall be included the study of the following subjects:

"(A) The language arts, including reading, writing, spelling, oral and written English, and literature;

"(B) Geography, the history of the United States and of Ohio, and national, state and local government in the United States;

"(C) Mathematics;

"(D) Natural science, including instruction in the conservation of natural resources;

"(E) Health and physical education, which shall include instruction in the harmful effects, and legal restrictions against the use of drugs of abuse, alcoholic beverages, and tobacco;

"(F) The fine arts including music;

"(G) First aid, safety and fire prevention.;

"Every school shall include in the requirements for promotion from the eighth grade to the ninth grade one year's course of study of American history.

"* * *."

The amendment to R. C. 3313.60, effective November 28, 1975, substantially changed paragraphs (B) and (E) of the foregoing to include additional curriculum requirements, and also added a separate requirement that physical education be taught.

[7]R. C. 3313.48 provides, in pertinent part:

"* * * Except as otherwise provided in this section, each day for grades one through six shall consist of not less than five clock hours with pupils in attendance which may include fifteen minute morning and afternoon recess periods, except in such emergency situations, including lack of classroom space, as are approved by the State Board of Education."

[8]See fns. 4 and 5, *supra*.

requiring a school day of a defined length, and effectively controlling the courses of study taught non-public school children, do not further impede the ability of a religious school to incorporate the tenets of its particular faith into its required courses. We think that EDb-401-02 (G) "unduly burdens the free exercise of religion"[9] and interferes "with the rights of conscience,"[10] by requiring a set amount of time to be devoted to subjects which, by their very nature, may not easily lend themselves to the teaching of religious principles (*e. g.*, mathematics). We do not mean to imply that the subjects contained within EDb-401-02(G), or those contained within R. C. 3313.60, are not helpful in preparing non-public, as well as public, school children for the obligations which will eventually arise in the process of maturing into adulthood. We only emphasize that the reasonableness of the requirements contained within "minimum standard" EDb-401-02(G) wanes in the face of an attack premised upon a violation of the constitutional right of appellants to the free exercise of their chosen religion.

Secondly, in our view, EDb-401-02(O), which requires "all activities" of a non-public school to conform to policies adopted by the board of education, plainly violates appellants' right to the free exercise of their religion. If the state is to discharge its duty of remaining strictly neutral, pursuant to the establishment clause of the First Amendment, with respect to religion, how can the state constitutionally require *all activities* of a non-public religious school, which, of necessity, must include *religious activities*, to conform to the policies of a purportedly "neutral" board? As stated long ago in *Bd. of Edn.* v. *Minor* (1872), 23 Ohio St. 211, 249-251:

"* * * The state can have no religious opinions; and if it undertakes to enforce the teaching of such opinions, they must be the opinions of some natural person, or class of persons. If it embarks in this business, whose opinion

---

[9]*Wisconsin* v. *Yoder, supra* (406 U. S. 205, 220).

[10]Section 7, Article I of the Ohio Constitution. See fn. 3, *supra*.

shall it adopt? If it adopts the opinions of more than one man, or one class of men, to what extent may it group together conflicting opinions? [O]r may it group together the opinions of all? And where this conflict exists, how thorough will the teaching be? Will it be exhaustive and exact, as it is in elementary literature and in the sciences usually taught to children? [A]nd, if not, which of the doctrines or truths claimed by each will be blurred over, and which taught in preference to those in conflict?

*  *  *  *

"But it will be asked, how can religion, in this general sense, be essential to good government? Is atheism, is the religion of Buddha, of Zoroaster, of Lao-tse, conducive to good government? Does not the best government require the best religion? Certainly the best government requires the best religion. It is the child of true religion, or of truth on the subject of religion, as well as on all other subjects. But the real question here is, not what is the best religion, but how shall this best religion be secured? *I answer, it can best be secured by adopting the doctrine of this 7th section in our own bill of rights, and which I summarize in two words, by calling it the doctrine of 'hands off.'* Let the state not only keep its own hands off, but let it also see to it that religious sects keep their hands off each other. Let religious doctrines have a fair field, and a free, intellectual, moral, and spiritual conflict. The weakest—that is, the intellectually, morally, and spiritually weakest—will go to the wall, and the best will triumph in the end. This is the golden truth which it has taken the world eighteen centuries to learn, and which has at last solved the terrible enigma of 'church and state.' Among the many forms of stating this truth, as a principle of government, to my mind it is nowhere more fairly and beautifully set forth than in our own constitution. Were it in my power, I would not alter a syllable of the form in which it is there put down. It is the true republican doctrine. It is simple and easily understood. It means a free conflict of opinions as to things divine; and *it means masterly inactivity on the part of the state,* ex-

cept for the purpose of keeping the conflict free, and preventing the violation of private rights or of the public peace. Meantime, the state will impartially aid all parties in their struggles after religious truth, by providing means for the increase of general knowledge, which is the handmaid of good government, as well as of true religion and morality. *It means that a man's right to his own religious convictions, and to impart them to his own children, and his and their right to engage, in conformity thereto, in harmless acts of worship toward the Almighty, are as sacred in the eye of the law as his rights of person or property, and that although in the minority, he shall be protected in the full and unrestricted enjoyment thereof.* The 'protection' guaranteed by the section in question, means protection to the minority. The majority can protect itself. Constitutions are enacted for the very purpose of protecting the weak against the strong; the few against the many." (Emphasis added.)

Although this passage has been modified to some extent in recent years with regard to the responsibilities of the state in the area of non-public education, see *Wisconsin* v. *Yoder, supra* (406 U. S. 205, 213), and *Board of Edn.* v. *Allen, supra* (392 U. S. 236, 245), it retains continued vitality, nonetheless, as an accurate expression of the necessary distinction between church and state, and as a perpetual warning of the potential pitfalls awaiting unreasonable and excessive state involvement in matters touching upon convictions of conscience.

Viewed in the above light, the inconsistency inherent in EDb-401-02(O), and the concomitant unconstitutional interference with, and infringement upon, appellants' rights to freely pursue their religious beliefs, is apparent to a majority of this court.

Finally, EDb-401-07(B), which requires a non-public religious school to cooperate with elements of the community in which it exists, infringes upon the rights of these appellants, consistent with their religious beliefs, to engage in complete, or nearly complete, separation from community

affairs. As Rev. Whisner testified, these appellants religiously adhere to the literal Biblical command that they "[b]e not conformed to this world * * * ." Upon the face of the record before us, the state may not require the contrary.

In light of the foregoing, we conclude that appellants have sustained their burden of establishing that the "minimum standards" infringe upon the right guaranteed them by the First Amendment to the Constitution of the United States, and by Section 7, Article I of the Ohio Constitution, to the free exercise of their religion.

At this juncture, we must take notice that although the state has strenuously maintained throughout the proceedings in this cause that the "minimum standards" with which appellants must comply are contained only in the first 15 pages of the publication, Minimum Standards for Ohio Elementary Education, the introduction to the Interpretative and Explanatory Information section, at page 19 of that publication, contains the following statement: "Level I details the academic and operational programs required for compliance with the adopted minimum standards." (Emphasis added.) Moreover, the testimony of state witness John E. Brown disclosed that the interpretative comments form a part of the "minimum standards," and that level I therein may not be ignored by a school.

As previously stated herein, appellants have strenuously objected to numerous comments appearing in the aforesaid section purportedly containing only "Interpretative and Explanatory Information." Basically, appellants contend that these comments are not neutral at all, but rather espouse a philosophy of "secular humanism." Expert witness Donald A. Erickson reached the same conclusion, stating that:

"It is not at all, as I view it a neutral document. And I would point particularly to the passages on the social studies.

"If they don't enunciate an educational philosophy on social studies, then I have no idea what, and I have no hesitation in identifying that philosophy that is spelled out here as a secular humanism philosophy."

In this regard, we share the concern of appellants that the philosophy espoused especially in EDb-401-03(B), relating to the teaching of citizenship, social studies and health, may be interpreted as promoting "secular humanism," and, as such, may unconstitutionally be applied to these appellants to "unduly burden the free exercise of religion," should that section of the publication be interpreted as part of the "minimum standards." We do not decide that issue in this case, however, for we conclude that the clear intent of the publication, Minimum Standards for Ohio Elementary Education, taken as a whole, is to establish only the requirements contained within the first 15 pages thereof as *the* "minimum standards." We base our conclusion upon four factors: (1) The format of the publication itself provides an express line of demarcation between the "minimum standards" and the "Interpretative and Explanatory Information"; (2) A decidedly different method of expression is utilized in each such section to convey the material included therein (*i. e.,* in the initial 15 pages of the publication, the "minimum standards" are set forth in a short and succinct manner, and are divided, in an orderly fashion, into sections and subsections; however, in the Interpretative and Explanatory Information section, no such rigid order or declaratory style is maintained); (3) The introduction to the Interpretative and Explanatory Information section declares, at page 19, that "[t]he objective was to *clarify the intent* of the standards through descriptions of practices and activities employed by school districts in compliance"; and (4) The state's witness, Brown, testified that a school not in compliance with the provisions contained within the latter section could still be chartered "as a matter of interpretation on the book."

There is an additional, independent reason, ignored by the lower courts in this case, that compels upholding appellants' attack upon the state's "minimum standards." In our view, these standards are so pervasive and all-encompassing that total compliance with each and every standard by a non-public school would effectively eradicate the

distinction between public and non-public education, and thereby deprive these appellants of their traditional interest as parents to direct the upbringing and education of their children.

In three early cases, *Farrington* v. *Tokushige* (1927), 273 U. S. 284,[11] *Pierce* v. *Society of Sisters* (1925), 268 U. S. 510,[12] and *Meyer* v. *Nebraska, supra* (262 U. S. 390),[13] the

---

[11]At issue in *Farrington* was the right of parents to direct the education of their children by sending them to a foreign language school. The legislature of Hawaii, at that time a territory, had passed a statute which comprehensively regulated all foreign language schools in operation in the territory. The statute, provided, *inter alia*, that: (1) All foreign language schools and teachers employed therein must obtain a permit from the Department of Public Instruction; (2) the Department of Public Instruction shall have full power to prescribe by regulations the requirements prerequisite to pupil entrance into the schools, the subjects and courses of study that could be taught, and the textbooks that could be used; and (3) the schools could not operate before, or during, the hours of public school operation.

With respect to the statute, the court stated:

"The foregoing statement is enough to show that the school Act and the measures adopted thereunder go far beyond mere regulation of privately-supported schools where children obtain instruction deemed valuable by their parents and which is not obviously in conflict with any public interest. They give affirmative direction concerning the intimate and essential details of such schools, intrust their control to public officers, and deny both owners and patrons reasonable choice and discretion in respect of teachers, curriculum and textbooks. Enforcement of the act probably would destroy most, if not all, of them; and, certainly, it would deprive parents of fair opportunity to procure for their children instruction which they think important and we cannot say is harmful. * * *"

[12]In *Pierce*, an Oregon statute requiring parents to enroll their children in public schools was attacked by the Society of Sisters, an Oregon corporation devoted to the secular and religious education of children through schools it operated in the state, as conflicting with the right of parents to direct the secular and religious education of their children. In striking down the statute the court stated:

"The inevitable practical result of enforcing the act under consideration would be destruction of appellees' primary schools, and perhaps all other private primary schools for normal children within the state of Oregon. These parties are engaged in a kind of undertaking not inherently harmful, but long regarded as useful and meritorious. Certainly there is nothing in the present records to indicate that:

court utilized the "liberty" concept" embodied within the due process clause of the Fourteenth Amendment to invali-

---

they have failed to discharge their obligations to patrons, students[,] or the state. And there are no peculiar circumstances or present emergencies which demand extraordinary measures relative to primary education.

"Under the doctrine of *Meyer* v. *Nebraska,* 262 U. S. 390, we think it entirely plain that the Act of 1922 *unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control.*" (Emphasis added.)

[13]In *Meyer,* appellant, a teacher was convicted of violating a Nebraska statute which prohibited instruction in any school, public or non-public, in any language other than the English language. In reviewing his conviction, the court framed the issue as follows:

"The problem for our determination is whether the statute, as construed and applied, unreasonably infringes the liberty guaranteed to the plaintiff in error by the 14th Amendment. 'No state shall * * * deprive any person of life, liberty, or property without due process of law.' "

In reversing the conviction, the court stated:

"While this court has not attempted to define with exactness the *liberty* thus guaranteed, the term has received much consideration, and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint, but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and, generally, to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.
"* * *

"The challenged statute forbids the teaching in school of any subject except in English. * * * Evidently the legislature has attempted materially to interfere with the calling of modern language teachers, with the opportunities of pupils to acquire knowledge, *and with the power of parents to control the education of their own.*
"* * *

"* * * We are constrained to conclude that the statute as applied is arbitrary and without reasonable relation to any end within the competency of the state." (Emphasis added.)

[14]*Farrington, Pierce,* and *Meyer* were all decided prior to *Cantwell* v. *Connecticut* (1940), 310 U. S. 296, in which the liberties guaranteed by the First Amendment were incorporated into the Due Process Clause of the Fourteenth Amendment, and thereby made directly applicable to the states.

214

date legislation that interfered with the right of a parent to direct the education, religious or secular, of his or her children. Thus, it has long been recognized that the right of a parent to guide the education, including the religious education, of his or her children is indeed a "fundamental right" guaranteed by the due process clause of the Fourteenth Amendment.

The principle espoused in *Farrington, Pierce* and *Meyer* was recognized as contemporarily valid in *Wisconsin* v. *Yoder, supra* (406 U. S. 205), where, at page 232, the court stated:

"* * * The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition. If not the first, perhaps the most significant statements of the Court in this area are found in *Pierce* v. *Society of Sisters*, in which the Court observed:

"'Under the doctrine of *Meyer* v. *Nebraska*, 262 U. S. 390, we think it entirely plain that the Act of 1922 unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control. As often heretofore pointed out, rights guaranteed by the Constitution may not be abridged by legislation which has no reasonable relation to some purpose within the competency of the State. The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.' 268 U. S., at 534-535.

"The duty to prepare the child for 'additional obligations' referred to by the Court, must be read to include the inculcation of moral standards, religious beliefs, and elements of good citizenship. *Pierce*, of course, recognized that

where nothing more than the general interest of the parent in the nurture and education of his children is involved, it is beyond dispute that the State acts 'reasonably' and constitutionally in requiring education to age 16 in some public or private school meeting the standards prescribed by the State.

"However read, the Court's holding in *Pierce* stands as a charter of the rights of parents to direct the religious upbringing of their children.* * * ''[15]

The "minimum standards" under attack herein effectively repose power in the state Department of Education to control the essential elements of non-public education in this state. The expert testimony received in this regard unequivocably demonstrates the absolute suffocation of independent thought and educational policy, and the effective retardation of religious philosophy engendered by application of these "minimum standards" to non-public educational institutions.

Through application of these "minimum standards" to non-public schools, the state retains the power to regulate the following: The content of the curriculum that is taught, the manner in which it is taught, the person or persons who teach it, the physical layout of the building in which the students are taught, the hours of instruction, and the educational policies intended to be achieved through the instruction offered. In short, what the state gives to a non-public school through including a requirement in the

[15]The decision in *San Antonio School District* v. *Rodriguez* (1973), 411 U. S. 1, does not affect the continued vitality of *Farrington* v. *Tokushige, supra* (273 U. S. 284), *Pierce* v. *Society of Sisters, supra* (268 U. S. 510), or *Meyer* v. *Nebraska, supra* (262 U. S. 390). In *Rodriguez,* the court, in the context of adjudicating a challenge to a Texas school financing statute based upon the Equal Protection Clause of the Fourteenth Amendment, concluded that the Constitution does not expressly or impliedly afford protection to the right to *receive* an education. The court, in *Rodriguez,* did not consider the issue raised in *Farrington, Pierce, Meyer, Wisconsin* v. *Yoder, supra,* and, in the instant cause, the issue relating to the right of a parent, protected by the "liberty" clause of the Fourteenth Amendment, to direct the education. secular or religious, of his or her children.

216

"minimum standards" that the operation of the school must be consistent with its own stated philosophy (EDb-401-02[A] and EDb-401-03[A]), it takes away by compelling adherence to all the "minimum standards," the effect of which is to obliterate the "philosophy" of the school and impose that of the state. This result obtains in spite of the legislative directive, in R. C. 3301.07, that "[i]n the formulation and administration of such standards for non-public schools the board shall also consider the particular needs, methods and objectives of said schools, provided they do not conflict with the provision of a general education of a high quality and provided that regular procedures shall be followed for promotion from grade to grade of pupils who have met the educational requirements prescribed."

Under the facts of this case, the right of appellants to direct the upbringing and education of their children in a manner in which they deem advisable, indeed essential, and which we cannot say is harmful, has been denied by application of the state's "minimum standards" as to them. The uncontroverted testimony establishes that appellants were aware that the Tabernacle Christian School did not conform to all the "minimum standards," but that such was not considered necessary by them because the education afforded their children enrolled at the school fulfilled their educational and religious preferences.

In the opinion of a majority of this court, a "general education of a high quality" can be achieved by means other than the comprehensive regimentation of *all* academic centers in this state. In the words of Thoreau:

"If a man does not keep pace with his companions,
Perhaps it is because he hears a different drummer.
Let him step to the music which he hears,
However measured or far away."[16]

Having demonstrated that application of the "minimum standards" to appellants violates their constitutional rights in two different ways, we turn, now, to the question

---

[16]Henry David Thoreau, Walden XVIII (1854).

of whether those standards may yet be sustained by the state. As in *Wisconsin* v. *Yoder, supra* (406 U. S. 205, 233), "when the interests of parenthood are combined with a free exericise claim of the nature revealed by this record, more than merely a 'reasonable relation to some purpose within the competency of the state' is required to sustain the validity of the state's requirement under the First Amendment." What is required is a finding "that there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause." *Id.,* at page 214.[17] Moreover, even if the state can establish the requisite degree of interest, it must yet demonstrate that such interests cannot otherwise be served in order to overbalance legitimate claims to the free exercise of religion. See *Id.,* at page 215; *Sherbert* v. *Verner, supra* (374 U. S. 398, 407); *Braunfeld* v. *Brown, supra* (366 U. S. 599, 607).

The state did not, either in this court or in the lower courts, attempt to justify its interest in enforcing the "minimum standards" as applied to a non-public religious school. In the face of the record before us, and in light of

---

[17] The opinion in *Yoder* did not clearly indicate whether the "compelling state interest" test was the appropriate standard by which to determine whether a state statute may be sustained when challenged as infringing the First Amendment right to the free exercise of religion. In this regard, the court stated:

"We turn, then, to the state's broader contention that its interest in its system of compulsory education is so compelling that even the established religious practices of the Amish must give way. Where fundamental claims of religious freedom are at stake, however, we cannot accept such a sweeping claim; despite its admitted validity in the generality of cases, we must searchingly examine the interests that the state seeks to promote by its requirement for compulsory education to age 16, and the impediment to those objectives that would flow from recognizing the claimed Amish exemption. See, e. g., *Sherbert* v. *Verner, supra*; *Martin* v. *City of Struthers*, 319 U. S. 141 (1943); *Schneider* v. *State*, 308 U. S. 147 (1939)."

By the reference to *Sherbert* v. *Verner*, however, we think it clear that the court, in *Yoder*, did not intend to depart from its prior decisions in which the "compelling state interest" test was determined to provide the proper standard for review in cases such as the instant cause. See *Sherbert* v. *Verner, supra* (374 U. S., at page 406).

the expert testimony summarized in the statement of the case herein, it is difficult to imagine "* * *" a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause." *Wisconsin* v. *Yoder, supra,* at page 214. And, equally difficult to imagine, is a state interest sufficiently substantial to sanction abrogation of appellants' liberty to direct the education of their children. We will not, therefore, attempt to conjure up such an interest in order to sustain application of the "minimum standards" to these appellants.

In conclusion, it should be noted that both sides to this dispute have pursued an overly litigious course in search of a resolution to the issues herein presented. Essentially, had the administrative procedure specifically devised for the purpose of securing a charter from the state to operate a school been utilized, with the attendant method for obtaining judicial review of the administrative proceedings guaranteed by R. C. Chapter 119, these appellants would not have found themselves subject to the disgrace, cost, and time which accompanies the criminal process. Constitutional litigation, although always available, was never intended to obviate otherwise equally serviceable methods of procuring the same conclusion.

For the foregoing reasons, the judgment of the Court of Appeals is reversed and the defendants are ordered discharged.

*Judgment reversed and defendants discharged.*

CORRIGAN, W. BROWN and P. BROWN, JJ., concur.

HERBERT and STERN, JJ., dissent from the syllabus and opinion, but concur in the judgment.

O'NEILL, C. J., not participating.

STERN, J., concurring in the judgment, but dissenting from the syllabus and the opinion. I write separately because I am convinced that the majority wholly misapprehends the nature and intent of Ohio's statutory provisions

for the chartering and regulation of private schools, and as a result of that misapprehension, holds the bulk of those provisions to be unconstitutional as applied. Under a more reasonable construction of those provisions, the constitutional isues raised by the majority need not, and, therefore, should not even be considered.

Under R. C. 3301.07, the State Board of Education is directed to exercise general supervision over public education in Ohio, and to "[f]ormulate and prescribe minimum standards to be applied to all elementary and high schools in this state for the purpose of requiring a general education of high quality." Those standards are to be applied to both public and private schools.

The essential incident to this supervision is the issuance of a state charter. Under R. C. 3301.16, the board "shall classify and charter school districts and individual schools within each district. Such board shall revoke the charter of any school district or school which fails to meet the standards for elementary and high schools as prescribed by the board." The charter certifies state recognition that the school sufficiently complies with the requirements imposed by the state under its responsibility and broad authority to ensure that each child receives a quality general education.

The General Assembly has provided, in R. C. 3301.07 (D), an extensive list of matters for which the board is to prescribe minimum standards, including the certification of teachers, the provision of facilities and equipment, and the administration of the school.[18]

---

[18]The first paragraph of R. C. 3301.07(D) provides:

"[The board shall] formulate and prescribe minimum standards to be applied to all elementary and high schools in this state for the purpose of requiring a general education of high quality. Such standards shall provide adequately for: a curriculum sufficient to meet the needs of pupils in every community; the certification of teachers, administrators and other professional personnel and their assignment according to training and qualifications; efficient and effective instructional materials and equipment, including library facilities; the proper organization, administration and supervision of each school, including

220

If this extensive plan of state regulation were to be imposed upon private schools to the same extent as upon public schools, there might be some force to the majority's contention that this plan is so comprehensive as to intrude upon the right of a parent to direct the upbringing and education of his children. But, the General Assembly has specifically recognized and provided that those standards are not to be applied in the same way to private, non-tax-supported schools. The last paragraph of R. C. 3301.07(D) provides:

"In the formulation and administration of such standards for nonpublic schools the board shall also consider the particular needs, methods and objectives of said schools, provided they do not conflict with provision of a general education of a high quality and provided that regular procedures shall be followed for promotion from grade to grade of pupils who have met the educational requirements prescribed."

This provision clearly belies any claim that the minimum standards formulated by the board are to be strictly imposed upon nonpublic schools. Rather, it only requires as a minimum that the board assure that a nonpublic school give a quality general education and follow a system of promotion from grade to grade. Both of these requirements are beyond any question well within the state's authority and responsibility for the education of its citizens. In addition to those requirements, the board is directed to consider the particular needs and methods of each nonpublic school, and the board would be in error if it failed to do so. The board would also be in error, we may assume, if it abused its discretion in failing to grant an exemption from one

---

regulations for preparing all necessary records and reports and the preparation of a statement of policies and objectives for each school; buildings, grounds, health and sanitary facilities and services; admission of pupils, and such requirements for their promotion from grade to grade as. will assure that they are capable and prepared for the level of study to which they are certified; requirements for graduation; and such other factors as the board finds necessary."

or more of the minimum standards when a nonpublic school made an adequate showing of the need for such exemption.

This statutory scheme of formulating minimum standards which are to be administratively modified in accordance with the particular circumstances of different private schools, subject to administrative and judicial review, is a completely reasonable legislative provision. It appropriately recognizes the need for state regulation to assure quality education, while giving due consideration to the special circumstances and needs of Ohio's private schools. Were this a civil case involving the question of whether a private religious school must comply with this statutory scheme and obtain a state charter, it would be sufficient to conclude that the school is indeed required to do so, and that if the charter were to be improperly denied, the school could secure relief under the provisions for administrative review contained in R. C. Chapter 119, or, if necessary, in an appeal therefrom to the courts.

In this case, however, the major difficulty is that this question is raised in the context of a criminal prosecution brought, in part, under R. C. 3321.03 against parents who are sending their children to this non-chartered school. R. C. 3321.03 states, as pertinent:

"Except as provided in this section, the parent, guardian, or other person having the care of a child of compulsory school age which child has not been determined to be incapable of profiting substantially by further instruction shall cause such child to attend a school which conforms to the minimum standards prescribed by the State Board of Education for the full time the school attended is in session, or shall otherwise cause him to be instructed in accordance with law."

The contention of the appellants is that this statute requires them to send their children to a school which satisfies all the minimum standards established by the board; that some of those standards, at least as applied to them, would infringe upon their constitutional rights to the

free exercise of their religion and the direction of their children's upbringing; and that therefore this criminal statute is unconstitutional as applied to them.

Brief reflection will make it apparent that this interpretation of the statute is in conflict with the other statutory provisions for chartering and regulation of private schools, and that it would lead to absurd and impermissible results. It would mean that a parent would be criminally liable for sending his child even to a private school granted a charter by the state board, if in granting that charter the board carried out its statutory responsibility and waived certain of the printed minimum standards because of the particular needs of the school. Similarly, that interpretation would render criminally liable a parent who sent his child to a chartered school, public or private, which the state board had mistakenly found to meet the minimum standards, or which had unwittingly ceased to meet one of those standards since the last inspection by the state board's examiners.

Certainly, no such capricious and absurd result was intended by the General Assembly. Rather, R. C. 3321.03 must be read in terms of its context and purpose, and *in pari materia* with R. C. 3301.07 and 3301.16. The use of the printed minimum standards is in the administrative process of granting or denying a state charter. At the conclusion of that process, the school is either granted a charter certifying that it meets the minimum standards required of it by the state, as those may have been administratively modified in the case of a private school, or the school is denied a charter. The state board may also revoke the charter of a school which subsequently falls below the standards thus established. Construed in light of this administrative procedure, the requirement of R. C. 3321.07 that each nonpublic school child attend "a school which conforms to the minimum standards prescribed by the State Board of Education" means simply that the child must attend a school which has been granted a state charter, or a school whose application for such a charter has been sub-

223

mitted and has not been denied. A parent violates this statute if he sends his child to a school which has not even applied for a charter, or which has been denied a charter, or which has had its charter revoked.

These appellants were in violation of R. C. 3321.03 as it is thus properly construed, for the Tabernacle Christian School has made no actual application to the state board for a charter. The meeting of Reverend Whisner with an official of the Department of Education, and his letter offering to submit a plan pursuant to obtaining a charter, in no way constituted an actual application. Nevertheless, it must be recognized that this was a criminal prosecution and that the construction which has been given to these statutes, though reasonable and necessary, has been upon first impression. This construction is one which differs from that suggested by the testimony of the state official called as a witness at trial, and is one which requires that the statute be read *in pari materia* with related statutes. Although I reject the construction of R. C. 3321.03 proposed by appellants, and by the state as well, I do not find that construction to be an implausible reading of the bare language of that statute. I do find, on the other hand, that the claims of possible infringement upon freedom of religion which might result from a strict application of the printed minimum standards to the appellants' school raise serious issues, for which there would be no remedy, under the state and the appellants' literal interpretetion of R. C. 3321.03, other than defiance of the criminal sanction. Under these circumstances, I would hold that R. C. 3321.03 failed to give adequate notice to the appellants of their rights and responsibilities, and is for that reason impermissibly vague as applied to the claims of constitutional right asserted by these appellants.

I would accordingly reverse these convictions and hold R. C. 3321.03 to be constitutional as construed herein, and as applied prospectively.

HERBERT, J., concurs in the foregoing opinion.