Rev. Randy JOHNSON, Mr. & Mrs. Richard Rutherford, Mr. & Mrs. Fred Pruessner, Mr. & Mrs. Martin Miller, Mrs. Mary Drake, Mrs. Gail Vosburgh, Mrs. Henrietta Santee, Mr. & Mrs. Ronald Callow, Mr. & Mrs. Frank Marion, Mr. & Mrs. Gary Nelson, Mr. & Mrs. Michael Hoffman, Mr. & Mrs. Richard Hoffler, and Calvary Baptist Church, Appellants,

v.

CHARLES CITY COMMUNITY SCHOOLS BOARD OF EDUCATION, Iowa State Board of Public Instruction, Robert Benton, State Superintendent of Public Instruction Mark Klett, District Secretary for Charles City Community Schools Board of Education, Ronald Noah, Floyd County Attorney, Philip N. Norland, Worth County Attorney, Richard N. Tompkins, Cerro Gordo County Attorney, and William A. Heintz, Chickasaw County Attorney, Appellees.

Fred M. PRUESSNER and Donna Pruessner, Rev. A.C. Wegner, Jr., Martin Miller and Emily Miller, Dallas Michelson and Jean Michelson, Robert J. Crooks and Sue Crooks, and Gail Vosburgh, Appellants,

v.

Dr. Robert BENTON, Superintendent of Public Instruction and State Board of Public Instruction, Appellees.

No. 83–493.

Supreme Court of Iowa.

May 22, 1985.

Rehearing Denied July 26, 1985.

Craig R. Hastings, Ames, and Daniel John Loomis and Charles E. Craze of Gibbs & Craze Co., L.P.A., Cleveland, Ohio, for appellants.

Thomas J. Miller, Atty. Gen., Merle Wilna Fleming, Asst. Atty. Gen., Ronald K. Noah, Floyd Co. Atty., William A. Heintz, Chickasaw Co. Atty., and Judith O'Donohoe, Charles City, for appellees.

HARRIS, Justice.

Plaintiffs are the pastor and certain members of a fundamentalist Baptist

church in Charles City. The controversy arose following their organization of a parochial school. The parents were charged with violating Iowa's compulsory attendance law, Iowa Code section 299.1 (1983). The section is quite typical in that it places the sanction for failure to attend on the parent rather than the child. The parents here responded by bringing two separate proceedings. One was a declaratory judgment action which challenged our statutory education requirements, not only the compulsory attendance statute but also certain reporting requirements in chapter 299. The second response was to apply to the state board of public instruction for relief under section 299.24, popularly called the Amish exception. After the administrative application was denied, the plaintiffs filed for judicial review under section 17A.19. The declaratory judgment action and judicial review proceedings were consolidated for trial in district court and for this appeal.

The district court denied declaratory relief and affirmed on the administrative appeal. We agree with plaintiffs' contention that the religious freedoms guaranteed them under the first amendment entitle them to educate their children at the private religious school they have established. The same guarantees accord them the right to operate the school with minimal necessary supervision by the state. A two-fold difficulty with the appeal is that (1) we are not presented with any developed minimal necessary standards, and (2) their absence is not an issue on appeal. The assignments of error address the state's fundamental authority to set any educational standards for private religious schools. Because we reject plaintiffs' assignments of error we affirm the trial court.

Both challenges are rooted in the plaintiffs' deeply held religious beliefs. They perceive their school, which they describe as their "week day educational ministry," to be an integral part of the exercise of their religion. It is named Calvary Baptist Christian Academy.

When it was set up in the fall of 1980 the school was not incorporated separately from the church. The curriculum chosen, the Accelerated Christian Education Program, has not as yet been challenged as inadequate by any state authorities. At the bottom of this litigation is the fact that plaintiffs are unwilling to submit to any state inquiry on the matter. In their view, the educational content and process of their school, because it is so central to their religion, is not properly subject to state oversight. The appellants state their requirements for their program as follows:

[C]ertain requirements had to be met by the students, their parents, and staff.... First of all, the pastor had to be the earthly head of the ministry just as with the bus ministry, Sunday school, or any other ministry of the church. Second, all of the supervisors and assistants had to be members of the church to assure their agreement with the church's doctrinal position and to subject them to the discipline of the church. Third, the atmosphere of the rooms in which the students met had to focus their attention on the Lord Jesus. Fourth, all of the curriculum materials had to be permeated with the biblical convictions held by the church; Calvary Baptist Christian Academy was not planned to be a school teaching secular subjects with a course in bible tacked on. Fifth, all the students were required to take part in all the studies and activities of the curriculum. Sixth, all subjects were presented from a biblical point of view without apology, there was no need or any opportunity for any assistant to present a subject from a so-called "secular" point of view. Finally, the parents of the students were required to agree with the doctrinal position of the church or agree to have their children taught such doctrinal position. The same conditions hold today for Calvary Baptist Christian Academy as they did in 1980. The standards are the same and the curriculum is even more pervasively biblical.

According to the trial court's findings, beginning in the 19th century, there has

been growing concern among Christian "fundamentalist" churches with what they consider to be the calamitous threat of secular humanism. The trial court pointed out in its findings:

The United States Supreme Court [*Engel v. Vitale*, 370 U.S. 6121 [421], 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962)] ruling in the year 1962 banning prayer from public classrooms was deemed a "last straw" by many "fundamentalists" and subsequent thereto "fundamentalists" have been vigorous in establishing nonpublic "Christian" schools connected to "fundamentalist" churches such as plaintiff church. Another apparent "last straw" has been the teaching of Darwin's theory of evolution as modified from time to time, but not the "fundamentalist's" version of creation as contained in Genesis.

It was to answer this perceived threat that the plaintiffs felt impelled to establish their own school. The trial court's findings continue.

Calvary Baptist Church began operations of its school or academy in the fall of 1981, within the same structure as Calvary Baptist Church and with children coming only from church members and with no separate school organization, so that Pastor Johnson is the head of the school to the same extent that he is head of the Church. He asserts that the school is a necessary and integral part of the church. He asserts that he and likeminded fundamentalists believe that since God created everything including truth, all learning or education involves education in God's truths and that education and religion are therefore one and the same and inseparable. He asserts that a person cannot have religion without education and cannot have education without religion.

Pastor Johnson further asserts that he has selected teachers for the church school after prayer and after learning of God's will in the matter, and, therefore, his selection of a teacher is God's selection of a teacher and that a mere state can have no part in either approving or disapproving or controlling or having any influence or licensing or certifying authority as to school teachers of his church school. Similarly, [Pastor] Johnson and others assert that he chose the ... curriculum for his school after prayer and communion with God, and that his selection of the curriculum is God's will, and that no mere state can approve or disapprove or have any influence of any kind whatsoever or any right or veto or control of God's curriculum.

[Pastor] Johnson and others assert that the church school is a "ministry" or essential religious function of the church and that the state has no more authority to control or regulate the Monday through Friday church school than it has to regulate the Sunday church school.

Plaintiffs also assert that the bible vests in the parents and church the exclusive obligation to educate children, and since the bible grants no educational authority to the state it has none.

[Pastor] Johnson and other plaintiffs similarly assert that any reporting requirements with respect to the church school are tantamount to reporting requirements of essentially religious functions of the church and therefore are constitutionally invalid.

■ I. Iowa law does not require that all children attend public schools, reflecting a long tradition of friendly coexistence between private and public schools. *See* Sage: *A History of Iowa*, pp. 102–03 (1974). This accommodation, dating from the first years of our statehood, was reached at least three quarters of a century before the United States Supreme Court ruled that a state cannot compel all students to be educated in public schools. *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

The *Pierce* opinion, however, carefully and expressly excluded from its sweep any limitation or curtailment of

the power of the state reasonably to regulate all schools, to inspect, supervise, and examine them, their teachers and pupils; to require that all children of

proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare.

268 U.S. at 534, 45 S.Ct. at 573, 69 L.Ed. at 1077.

The power thus acknowledged in the states to provide out of social necessity for minimum educational standards has enjoyed continuing endorsement in later opinions. *See Wisconsin v. Yoder*, 406 U.S. 205, 213, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15, 24 (1972) ("There is no doubt as to the power of a State, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education."); *Lemon v. Kurtzman*, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745, 756 (1971) ("[S]tate requirements under school-attendance laws are examples of necessary and permissible contact" between government and religious organizations, illustrating the impossibility of "total separation of [church and state] in an absolute sense."); *Sherbert v. Verner*, 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965, 970 (1963) (free exercise of religion may be subordinate to overriding, compelling state interest in regulation of proper subject).

Plaintiffs' response to these holdings is not altogether consistent, perhaps because they are not entirely agreed among themselves. In their appellate brief they suggest that most of the parents "would be willing to provide certain information regarding their children of compulsory school age provided it would not result in any supervision or inspection of the [school]." They suggest an "accommodation ... from [Iowa] statutes and regulations in meeting the public's interest through less drastic means such as testing." These stated positions can scarcely be said to square with the position stated by Pastor Johnson in his testimony that the selection of a teacher is made by God and a state can have no influence over the matter, even through

certification or licensing. Neither is it in step with his view that school curricula are not subject to state approval, disapproval, or influence because they are set by God alone.

■ We reject these views out of hand. While the state authority to intrude into private religious schools is, as we shall point out, confined to a necessary minimum, a clear authority, even a duty, does exist.

■ II. The foregoing authorities also make it clear that first amendment considerations limit the extent to which a state can intrude into the educational affairs of a private religious school. Under *Pierce*, parents are free, notwithstanding compulsory education statutes, to provide for a private education in a religious forum of their own choosing. This fundamental right would be hollow to the point of nonexistence if the state were to so closely superintend the school as to compromise its religious independence. Plaintiffs' fear of such an unconstitutional intrusion is legitimate. In *State v. Whisner*, 47 Ohio St.2d 181, 351 N.E.2d 750 (1976) an Ohio scheme for regulating private religious schools was struck down as violative of first amendment rights. The Ohio regulations allocated instructional time to various subjects, limited the school to policies adopted by local boards of education, and committed the private school to cooperating with county school officials. Such a scheme was properly held to infringe upon the first amendment rights of the private school patrons. One ground for the holding is persuasive:

In our view, these standards are so pervasive and all-encompassing that total compliance with each and every standard by a non-public school would effectively eradicate the distinction between public and non-public education, and thereby deprive these appellants of their traditional interest as parents to direct the upbringing and education of their children.

47 Ohio St.2d at 211–12, 351 N.E.2d at 768.

In their appellate brief and upon oral submission of their appeal the plaintiffs, as

mentioned, suggest that their position of absolute and total rejection of any public regulation can and should be accommodated by Iowa's educational scheme. Yet they concede the general right of the public to demand education for all its children. Plaintiffs suggest that the public could satisfy its rightful role while at the same time protecting plaintiffs' first amendment rights by merely testing the children.

We reject the suggestion because it does not do enough for the children. To merely test the children, as we shall explain in a later division, does not satisfy the state's rightful role. Whatever limitations are imposed on the state's general right and duty to see to the education of its youth, the right extends beyond occasional testing. It plainly extends to such matters as basic parameters for curriculum and teacher qualifications.

Sincere persons such as these plaintiffs are often unpersuaded by legal authorities. Religious views prompt them to think they must answer to some authority higher than the law. Over the centuries our legal system has become relatively tolerant in accommodating even those who reject it, especially those who do so for religious reasons. But a point is reached after which the accommodation must be offered by the dissenting citizen rather than the state. One such point, long established in this country, is to be found in the compulsory education laws.

A principal difficulty in plaintiffs' assertion is that anyone can make it, not only high-minded and sincere people, but also a host of others whose childrens' educations also are at stake.

The state has a clear right to set minimum educational standards for all its children and a corresponding responsibility to see to it that those standards are honored. When such standards are set in place, compliance with them falls within the ambit of the fundamental contract between the citizen and society. It need

scarcely be said that each of us, in order to enjoy membership in an organized social order, is pledged to adhere to a number of minimum norms. Of these, one of the most central is society's duty to educate its children.

The nature and extent of education remain largely a matter of personal choice. But there are basic minimums and, this being true, it is up to the people as a whole to set them. One way they have done this is to enact compulsory education statutes. A citizen must submit to them, persuade society to change them, or join a society without them.

III. The necessary minimum standards which a state can impose on a private religious school fall under the ambit of a provision in the compulsory education statute. Section 299.1, after imposing school attendance on children over seven and under sixteen years of age, provides an alternative:

In lieu of such attendance, such child may attend upon equivalent instruction by a certified teacher elsewhere.

The state board of public instruction certifies teachers by authority given in Iowa Code section 257.10(11) (1983). *See State v. Moorhead*, 308 N.W.2d 60, 64 (Iowa 1981). But no other statute defines "equivalent instruction." In *Moorhead*, we said the term means "instruction which is equal in kind and amount to that provided in public schools." *Id.* We however did not suggest that private religious schools can be made to submit to the sort of state regulation condemned in *Whisner*.

For reasons of their own the plaintiffs did not appeal on grounds of vagueness. This issue was litigated and decided by the trial court but it was not made an issue on appeal.[1] We mention this because of the unusual and unsatisfactory posture of certain crucial aspects of this controversy. Before the school can be required to submit to reasonable minimum regulations it is obvious the state is bound to place private schools on notice of the nature and extent of the necessary minimum standards. Our

---

1. It seems probable that plaintiffs were in no mood to assign the absence of standards as

error and at the same time insist the state had no right to set them.

holding in *Moorhead* is not authority to the contrary. Moorhead sought to educate his children by himself, without the aid of any school. No first amendment rights were claimed. Our *Moorhead* decision is not in point for persons who seek to operate a religious school for their own and other people's children.

When the state fails to adequately set necessary minimum standards for private religious schools, the patrons are presented with a ready defense to truancy charges. *State ex rel. Nagle v. Olin,* 18 O.O.3d 503, 511, 64 Ohio St.2d 341, 354–55, 415 N.E.2d 279, 288 (Ohio 1980) ("[U]ntil such time as the State Board of Education adopts minimum standards which go no further than necessary to assure the state's legitimate interests in the education of children in private elementary schools, the balance is weighted, *ab initio,* in favor of a First Amendment claim to religious freedom."); *State v. La Barge,* 134 Vt. 276, 357 A.2d 121, 125 (1976) (There is a special duty given the state department of education to define equivalent education under its regulatory authority, failing which, a prosecution should be dismissed.)

The trial court attempted with considerable effort and skill to supply standards by sorting through various school related statutes and ferreting out minimum statutory requirements. The state, which did not cross-appeal, is not altogether satisfied with the standards thus set and now invites us to refine and expand the trial court's efforts. We decline.

■ A court is without either the resources or expertise necessary to draft such a regulation. *See Wisconsin v. Yoder,* 406 U.S. at 235, 92 S.Ct. at 1543, 32 L.Ed.2d at 36. ("Courts are not school boards or legislatures, and are ill-equipped to determine the 'necessity' of discrete aspects of a State's program of compulsory education."); *State ex rel. Nagle v. Olin,* 18 O.O.3d at 510, 64 Ohio St.2d at 353, 415 N.E.2d at 288, ("the courtroom is simply not the best arena for the debate of issues of educational policy and measurement of

educational quality.") (quoting *State v. Shaver,* 294 N.W.2d 883, 900 (N.D.1980)).

■ When the parents are presented with a proper outline for the necessary minimum standards they can challenge them as an unconstitutional intrusion under the analyses explained in *Wisconsin v. Yoder,* 406 U.S. at 234–36, 92 S.Ct. at 1542–43, 32 L.Ed.2d at 36–37. Of course the burden would be upon the challenger to show the scheme is unconstitutional. *Moorhead,* 308 N.W.2d at 64.

It is enough here to reject the challenge plaintiffs do raise. We reject it because the state can reasonably regulate the basic educational requirements of all children within its borders. The state can inquire into private educational institutions in order to see this is done.

IV. One difference between Iowa's two statutory exemptions from compulsory attendance at public schools is notable. The legislature was specific in limiting the "equivalent instruction" allowable under section 299.1 to that furnished by "certified teachers." No such similar limitation was included within the Amish exemption under section 299.24. In seeking to qualify their school for the equivalent instruction exemption under section 299.1 the plaintiffs level a special challenge to the requirement for certified teachers. They keenly feel that this requirement is an oppressive intrusion into their right to provide their children with a religious type education, again claiming a first amendment violation because of their views that education is so intimately intertwined with religion.

Without doubt the selection of a teacher, crucially important for any school, is a matter of even more concern for a religious school. Persons who make the sacrifices required for maintaining a private religious school would be robbed of much of the benefit if unwanted instructors were to be forced upon them. The whole purpose of such a school is to foster the development of their children's minds in a religious environment. If the state were to unnecessarily control teacher selection a free exercise right could be threatened.

On the other hand the state's counterbalancing right and duty to the same children must again be considered. The parents have the clear right to select for them teachers with religious convictions which are consistent with the purpose of the school. But it is quite another thing to argue that those same teachers can be devoid of the qualifications of an educator.

We agree with the views expressed in *State ex rel. Douglas v. Faith Baptist Church, et al.,* 207 Neb. 802, 301 N.W.2d 571 (1981). The Nebraska Supreme Court concluded that a licensing requirement for teachers in private religious schools:

is neither arbitrary nor unreasonable; . . . it is a reliable indicator of the probability of success in [a] particular field. We believe it goes without saying that the State has a compelling interest in the quality and ability of those who are to teach its young people.

301 N.W.2d at 579. (Citing *Yoder* and its own decision in *Meyerkorth v. State,* 173 Neb. 889, 115 N.W.2d 585 (1962)).

The Nebraska court went on to reject a suggestion made here: that it would somehow satisfy state interests to inquire into the children's academic progress by testing:

Defendants insist that this can be accomplished by annual comparative tests. The problem with testing is that it sometimes comes too late. If the deficiency of the education being afforded is not discovered until the end of the year, the child has wasted that year.

*Id.* at 579. We agree that mere testing would be wholly inadequate to protect the state's rightful interests. A test looks only backward. It can, to a limited extent, measure whether a child has been receiving an education. The state is entitled to the assurance that the child is receiving an education.

V. It remains for us to consider plaintiffs' appeal from the district court decision on judicial review. Consolidated with the declaratory judgment action was plaintiffs' appeal under section 17A.19 from the determination of the state board of education

in the separate administrative proceeding. This was the proceeding in which plaintiffs sought a determination that their school should escape state control under section 299.24, the Amish exception.

This provision was noted in *Wisconsin v. Yoder,* 406 U.S. at 208, 92 S.Ct. at 1529, 32 L.Ed.2d at 21 n. 3, as Iowa's resolution of the conflict between compulsory education and the uniquely isolated Amish culture in our midst. Under section 299.24 certain religious societies can apply to the state superintendent for an exemption from the compulsory attendance laws. Upon being satisfied the requirements of the statute are met the superintendent, subject to the approval of the state board of public instruction, may, but is not required to, grant the exemption.

The district court quoted the material parts of section 299.24 as follows:

When members or representatives of a local congregation of a reorganized church . . . established for ten years or more within the State of Iowa prior to July 1, 1967, which professes principles or tenets that differ substantially from the objectives, goals, and philosophy of education embodied in the standards set forth in section 257.25, and rules adopted in implementation thereof, file with the state superintendent of public instruction proof of the existence of such conflicting tenets or principles, together with a list of the names . . . of all persons of compulsory school age desiring to be exempted from the compulsory education law and the educational standards law, whose parents . . . are members of the congregation . . . the state superintendent, subject to the approval of the state board of education, may exempt the members of the congregation . . . from compliance of any or all requirements of the compulsory education law and the educational standards law for two school years. When the exemption has once been granted, renewal of such exemptions for each succeeding year may be conditioned by the state superintendent, with the approval of the board, upon

proof of achievement in the basic skills ... by persons of compulsory school age exempted in the preceding year, which will be determined on the basis of tests or other means of evaluation selected by the state superintendent with the approval of the board....

The board of education denied the application in the belief there was no essential conflict between plaintiffs' legitimate educational goals and those specified in section 257.25. Section 257.25 specifies in considerable detail the educational standards for public schools in Iowa. The district court held there was nothing unreasonable, arbitrary, or capricious in the denial. It also held the denial did not render section 299.-24 unconstitutional as applied to the plaintiffs.[2]

Plaintiffs' administrative appeal challenges both of these determinations. Plaintiffs contend they fall within the ambit of the statute's language and hence qualify for the exemption. They also contend it is unconstitutional to deny them the exemption. Our scope of review differs for the two contentions.

We defer for a moment the constitutional ground of the plaintiffs' administrative challenge and first consider their direct assertion that the superintendent's rejection of their application for a statutory exemption was arbitrary and not in accordance with the plain meaning of section 299.24. Ground rules for this part of our review are well-settled. To state baseline principles for our review of administrative matters we often quote *Davenport Water Co. v. Iowa State Commerce Commission*, 190 N.W.2d 583 (Iowa 1971):

[The commerce] commission is the finder of fact, it being for us to ultimately determine, (1) issues of law, (2) whether commission acted unreasonably, arbitrarily, capriciously, in violation of applicable constitutional standards, or in excess of statutory authority, and (3)

whether its findings are supported by substantial evidence of record.... Our limited factual review is as it should be, since commission presumably has at its disposal the facilities and expertise with which to appropriately resolve detailed and complicated fact questions. This means we can intercede only when commission is clearly shown to have acted unconstitutionally, in violation of statutory mandate, or absent substantial support in the record.

*Id.* at 591–92.

■ It is this court's responsibility to interpret Iowa statutes but in making that interpretation we give deference to an administrative department's interpretation of the statute it administers. *West Des Moines Education Ass'n v. P.E.R.B.*, 266 N.W.2d 118, 124 (Iowa 1978).

The question here is whether plaintiffs' church "professes principles or tenets that differ substantially from the objectives, goals, and philosophy of education embodied in standards set forth in section 257.25, and rules adopted in implementation thereof...." § 299.24. It is a question the legislature called upon the superintendent to make, not because of his expertise in religion but because of his expertise in education.

■ In view of the historical background for section 299.24 (the plaintiffs themselves call it the "Amish exception") we do not think the legislature intended the exemption to be available to any and all church groups who seek to provide for a religiously oriented education. If this had been the legislative goal a much broader statute would have been required, such as the Kansas statute interpreted in *In Interest of Sawyer*, 234 Kan. 436, 672 P.2d 1093 (1983). Kansas statutes annotated section 72–1111(a)(2) exempts from Kansas compulsory school laws all children attending a private, denominational or parochial school taught by a competent instructor

---

2. Except for one such standard the district court upheld the denial. One of the standards in section 257.25 calls for rules to require "a multicultural non-sexist approach" for the teaching of

subjects. This standard, as applied to plaintiffs, was struck down as an unconstitutional infringement on plaintiffs' religious beliefs. There is no appeal from this determination.

for a period of time which is substantially equivalent to the period of time public school is maintained in the school district in which the private, denominational or parochial school is located.

It is readily apparent that Iowa's statute is aimed at a much smaller target; plainly, all parochial schools in the state are not intended for the exemption. The statute calls, not for a religious evaluation by the superintendent, but for an analysis of the educational goals of the group applying for exemptions and a comparison of those goals with those set up for public school children. Because of the conviction that religion is the basis for education, held by these plaintiffs and by all who support parochial education, the superintendent faces a mixed and somewhat complex question.

To obtain an exemption under section 299.24, plaintiffs had to prove their church "professes principles or tenets that differ substantially from the objectives, goals, and philosophy of education embodied in standards set forth in section 257.25, and rules adopted in implementation thereof...." As this provision has been interpreted and applied in this case, the "standards" in section 257.25 consist entirely of the listing in subsections 257.25(3) and (4) of subjects that must be taught in grades one through eight. No relevant implementing rules are involved. Therefore plaintiffs could establish their right to an exemption only if their church professes principles or tenets that differ substantially from the "objectives, goals, and philosophy of education" embodied in the areas of study listed in subsections (3) and (4) of section 257.25.

Plaintiffs offered no evidence that any principle or tenet of their church is in conflict with teaching the subjects listed in the statute. Rather, they insisted only that their church be able to teach those subjects in its own way with books and teachers of its own exclusive choice. Nothing in section 257.25, as interpreted and applied here, would deny them that opportunity. Thus the state board cannot be said to have acted unreasonably, arbitrarily or capriciously in rejecting their exemption request.

What prevents plaintiffs from having their way is not any objective, goal or philosophy of education embodied in section 257.25, but the requirement in section 299.1 that their church employ only certified teachers. Their church's opposition to that requirement, however, is not made a basis for obtaining an exemption under section 299.24. They must look to section 257.25, not section 299.1, to establish their right to exemption.

We conclude, giving due and required deference to the administrative findings of the superintendent, that the plaintiffs have not established any substantial dissimilarity between their educational goals and those specified for public schools, certainly none which sets them apart from all the many other parochial schools in the state. The administrative decision was not arbitrary or capricious under the standards described in *Churchill Truck Lines, Inc. v. Transportation Regulation Board*, 274 N.W.2d 295, 299–300 (Iowa 1979). The district court on judicial review was correct in so ruling.

VI. We next consider the first of two constitutional facets of plaintiffs' challenge to the administrative denial of their application for an Amish exemption. They first argue it was a violation of their first amendment rights to deny them the exemption.

Section 299.24 was our legislature's response to precisely the same concerns later involved in *Wisconsin v. Yoder*. The statute, its subject, purpose, meaning, and application are fully explained in the *Yoder* opinion.

The United States Supreme Court employed a balancing test to weigh the acknowledged and valid public interest in imposing reasonable regulations and minimum educational standards against the fundamental right of the Amish to direct the religious upbringing of their children. A number of factors were considered in the weighing:

(1) The sincerity of their commitment to a long established religion;

(2) An intricate and crucial interrelationship between those beliefs and their mode of life;

(3) The vital role their beliefs and life mode play in the survival of Amish culture;

(4) The hazards of enforcing compulsory education laws against them; and

(5) The adequacy, in terms of their peculiar needs, of the informal vocational education provided to their youth past the eighth grade.

The court found that the state failed to show how, on balance, its legitimate interest in assuring educated and self-reliant citizens justified a requirement that Amish children attend school for two additional years (past eighth grade) in contravention of their religious beliefs. The state moreover failed to prove that exempting the Amish from two additional years of education would seriously curtail the efficient operation of their school laws.

When the same factors are placed in balance on this record the opposite conclusion asserts itself. Sincerity of belief is the only factor wholly common to both the Amish and these plaintiffs. The beliefs of the plaintiffs are greatly less interwoven with their daily mode of life. The Amish culture is greatly more isolated from mainstream American life. Plaintiffs' children, for all the distinctive religious convictions they will be given, will live, compete for jobs, work, and move about in a diverse and complex society. Their educational needs are plainly not as circumscribed as those of Amish children. Neither does exposure to the more general American culture pose such an immediate threat to plaintiffs' mode of living as is the case with the Amish.

Whatever they may feel about their children's religious needs, the plaintiffs have not established that their children's educational needs are significantly different from those of other children. The superintendent's determination not to grant plaintiffs an Amish exception did not infringe upon their religious rights under the first amendment.

VII. Plaintiffs also ground their appeal from the decision on judicial review upon an equal protection claim. In its decision affirming the agency action the district court determined that plaintiffs were "not similarly circumstanced" to the Amish who were granted the statutory exception by section 299.24. We assume, without deciding, that the plaintiffs have standing to assert an equal protection claim. We nevertheless reject it because we think separate classifications for the Amish and these plaintiffs were justified.

■■■ An administrative agency's factual determinations are less sacrosanct than usual when the judicial review is of a constitutional question.

Even though supported by evidence, an administrative determination of certain fundamental facts bearing upon a constitutional or jurisdictional issue is not conclusive upon the courts, and with respect to such a determination the courts have the power and duty to exercise their own independent judgment.

2 Am.Jur.2d *Administrative Law* § 692 pp. 581–82 (1962). The authorities which in general require courts to yield to non-arbitrary administrative determinations uniformly provide an exception for constitutional questions. *Reter v. Davenport R.I. & N.W. Ry. Co.*, 243 Iowa 1112, 1124, 54 N.W.2d 863, 870 (1952); 73A C.J.S. *Public Law and Procedure* § 230, pp. 309–10 (1983). The distinction is unimportant here because material facts are not disputed.

■■■ On an equal protection challenge the first question is whether some fundamental right is involved. The answer determines the burden to be borne by the challenger. If no fundamental right is at issue the classification must be sustained unless it is patently arbitrary and bears no rational relationship to a legitimate government interest. *Lunday v. Vogelmann*, 213 N.W.2d 904, 907 (Iowa 1973). If a fundamental right is at issue the burden is quite different; the state must present a compel-

ling interest which is served by the discrimination. *Remmers v. Brewer*, 361 F.Supp. 537, 542 (S.D.Iowa 1973). A classification based on religion is such a fundamental right. *Id.*

We agree the state has met this more strict burden here. Without doubt, and plaintiffs agree, the state has a compelling interest in educating its youth. Education is said to be "perhaps the most important function of state and local government." *Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873, 880 (1954).

For reasons we have already explained we think this vital state interest is served by the classification. Education is of transcendent importance to all children. In the case of Amish children it can be compromised in favor of religious practice, though the loss to the children is obviously very great. The compromise can nevertheless be justified in view of the isolated lives the Amish children will live. We have no reason to suppose the religious convictions of these plaintiffs are any less sincere than those of the Amish. But the educational needs of their children must once more be considered in the balance.

The educational needs of the children involved here are, as we have said, much different and much greater than the needs of Amish children. Even at school age there is much greater mixing by these children in general society. Some church members send their children to other schools, a matter which would ostracize children from Amish culture. *Yoder*, 406 U.S. at 209, 92 S.Ct. at 1530, 32 L.Ed.2d at 21.

The principal difference is to consider the world for which the children here will have to be prepared. They will have to compete with well-educated children, will associate with them in a society very different from the simple, rural, and largely isolated one that lies ahead for Amish children. The state was fully justified in the classification. The equal protection challenge is rejected.

We would be remiss if we failed to acknowledge our debt to the distinguished trial court for its careful and exhaustive findings and the scholarship reflected in its decision.

AFFIRMED.

All Justices concur except SCHULTZ, J., who dissents, joined by UHLENHOPP, J.; and CARTER, J., who separately dissents.

SCHULTZ, Justice (dissenting).

Because I believe plaintiffs should have been granted an exemption under section 299.24, I dissent.

This appeal presents difficult constitutional problems involving a confrontation between the rights of the state and the religious freedom guaranteed under the Constitution. After a no-win confrontation with Amish parents and faced with the electors' revulsion caused by media pictures of peace officers chasing frightened children into cornfields, our legislature wisely avoided similar constitutional problems by the enactment of section 299.24. I believe that the exception provided in section 299.24 is as applicable to the appellants as it is to the Amish. By enacting this section, I believe the legislature not only intended to avoid placing our executive and judicial branch in the unpleasant position of attempting to enforce compulsory education on the Amish, but also attempted to eliminate this problem in relation to other religious groups who maintain unusual principles that clash with the state's philosophy of education. The State Board of Education should have given these appellants an exemption. I would reverse the trial court.

Iowa Code section 299.1 (1979) requires that all children over seven and under sixteen attend public school; it excepts children who attend "upon equivalent instruction by a certified teacher elsewhere." This exception applies to all who choose nonpublic education; it is not aimed at those with religious objections to public education and makes no attempt to accommodate those with religious objections.

Most private religious schools fall within this section because they have no objection to providing instruction equivalent to that received in public schools; they simply choose to offer additional religious instruction.

On the other hand, section 299.24 was designed for those whose religious beliefs "differ substantially from the objectives, goals, and philosophy of education embodied in standards set forth in section 257.25, and rules adopted in implementation." § 299.24. Nowhere does section 299.24 limit its application to the Amish. True, it arose out of the State's conflict with the Amish, recognizing that the State should accommodate those with strongly held religious beliefs, but it looked forward to potential application to others, stating that "members or representatives *of a local congregation of a recognized church* or religious denomination" could apply for an exemption. § 299.24. Section 299.24 provides an escape hatch to accommodate those with sincere religious beliefs that are substantially at variance with public education under our statute and rules.

The majority finds that plaintiffs do not fall within the section 299.24 exception because they have not shown "that their children's educational needs are significantly different from those of other children." The statute does not address different educational needs; it is aimed at those with different educational goals. Despite the majority's conclusion to the contrary, I believe plaintiffs have established different educational goals. Thus, I believe the administrative decision was arbitrary and capricious, requiring reversal.

Plaintiffs' ultimate educational goal is the glorification of God. Everything taught in their school must be taught from the perspective of their religious beliefs, emphasizing the role of God and the church in their lives and in every subject taught. The children are taught to make life decisions, not through a reasoning process based on the knowledge obtained through their education, but by resorting directly to God or God's word. Nowhere in section 257.25 do we find reference to a public education goal of teaching facts permeated with religion and teaching children to rely on God or God's word.

If this was the extent of appellants' religious dogma concerning Christian education, I might agree that the decision of the agency was not unreasonable. The majority suggests that our statute is aimed at a much smaller target than all parochial schools in the state. Although I would agree with that suggestion, I cannot agree with the implications contained in the majority opinion that places appellants in the same classification as other church groups who choose to provide a religious-oriented education. I perceive from the record that appellants are substantially different in some respects from our other private religious groups. Other parochial schools attempt to cooperate with public regulation of their schools, seeking public financial support and busing as long as the State does not interfere with their teaching of religious doctrines. The appellants, on the other hand, as a part of their ministry, insist that the exclusive right to educate belongs to the church and interpret the Bible to command their educational ministry. They share the conviction that there is no dichotomy between secular truth and sacred truth. Their educational ministry places the minister as the principal teacher. Their religious conviction that any relationship between the church and state is repugnant prevents the minister or any of the teachers from being certified by the state. Appellants' belief that teachers should be selected by the minister, in consultation with God, based largely on the doctrinal beliefs they are expected to convey to the students places them in direct opposition to the state's scheme of utilizing certified teachers because those teacher applicants who truly follow the doctrine of this church will refuse to become certified by the state. Although appellants may teach the same subjects in their school that are required in the public schools, they approach them from an entirely different philosophical standpoint and will accept no regulation or suggestion from state agencies. Appel-

lants have established strong and sincere religious beliefs which form the basis for educational goals, objectives and philosophies which substantially differ from those of public education.

In summary, I conclude that the agency and district court erred in the emphasis placed on the similarity between the curriculum of the church school and the educational standards set forth in section 257.25 along with the rules adopted in implementation. I would hold that the section 299.24 exemption is available to the appellants in this case because their goals are dissimilar to those of the state. I conclude that it was the intention of the legislature not only to avoid a confrontation, with its accompanying criminal sanctions, for the Amish but also for other types of religious groups whose beliefs cause them to be out of step with the state's scheme of enforced education by certified teachers. For this reason I believe the agency decision and that of the district court are arbitrary, capricious and unreasonable and should be reversed.

UHLENHOPP, J., joins this dissent.

CARTER, Justice (dissenting).

I dissent because I cannot accept the interpretation employed in the majority opinion with respect to the scope of the religious exemption granted by Iowa Code section 299.24. The present case involves the interpretation of a statutory religious exemption from compulsory attendance in the public schools the basic tenor of which is much broader than the area of constitutional protection recognized in *Wisconsin v. Yoder.*

The narrow interpretation which the majority opinion places on section 299.24[1] would deny the statute any meaningful application. The determination of whether the principles or tenets professed by an organized religion differ substantially from the "objectives, goals, and philosophy of education" embodied in the required curriculum of the public schools requires much more than a review of what courses are required and for what period of time. The forum passing on the request for exemption, in this case the state board of education, must scrutinize the substantive content of the various required courses of study and determine whether such content in any way offends against the principles or tenets of the religious group requesting the exemption. Clearly, the state board of education has not done this in the present case.

The matter of certified teachers is irrelevant to a proper analysis of the right to a religious exemption under section 299.24. There is no requirement that religious organizations claiming an exemption under section 229.24 must first seek equivalent instruction by certified teachers outside the public school system. Nor does the fact that the applicants may have attempted that alternative have any bearing on the elements to be considered in passing on the claim for exemption. The exemption is predicated upon conflict between religious tenets and the compulsory curriculum of the *public* schools. That is the only basis upon which such claims should be decided.

While I agree with the views expressed in the dissenting opinion of Schultz, J. that there is much evidence from which a determination favorable to the religious group can be made, it is for the state board of education to make such determinations and not this court. I would therefore reverse the judgment of the district court and remand the case to the state board of education with directions to reconsider the appellant's claim for religious exemption under those standards which I believe the statute imposes.

---

1. In my opinion, the interpretation of the exemption contained in the majority opinion matches that which was applied by the state board in the present case.