THE STATE, EX REL. NAGLE, APPELLEE, *v.*
OLIN, APPELLANT.

(No. 80-301—Decided December 30, 1980.)

*Mr. Otho Eyster,* prosecuting attorney, and *Mr. Kenneth E. Lane,* for appellee.

*Mr. Charles E. Craze, Mr. David C. Gibbs, Jr.,* and *Mr. Thomas D. Jungeberg,* for appellant.

*Per Curiam.*   Jennifer Olin, a child of seven years of age at the time of trial and being defendant's daughter, has attended since September 1977, a one-room Amish school located in Knox County known as the "Koppert's Korner" school. Jennifer was admitted by the Amish on a trial basis upon the request of her father. Students at Koppert's Korner are taught by one Jonas Nisely who has over 14 years of teaching experience despite the fact that his formal education

ended at the conclusion of the eighth grade. Consequently, he does not qualify for, nor has he ever held, a teaching certificate issued by the State Board of Education. Koppert's Korner school officials have not made application to the state for an elementary school charter, nor do they intend to do so.

At the time of trial, 26 children ranging in age from 6 to 14 years were enrolled at Koppert's Korner school in grades one through eight. Nisely teaches the students reading, writing, spelling, english, arithmetic, some history, some health, singing, geography and some drawing. Of these subjects reading, writing, arithmetic, english and spelling are emphasized. German is taught for one period each week. No courses in religion are conducted at the school.

The children learn arithmetic from texts published circa 1934. McGuffy readers no longer are used in the school to teach reading, although Nisely testified that he may return to using them.

The school building itself is constructed of clay block and is not equipped with electricity or other artificial lighting devices. The building is not fully equipped with indoor plumbing; rather, boys and girls attending the school use outhouses. The school is not inspected for health and fire purposes.

School is in session at Koppert's Korner 160 days each year from 8:30 a.m. to 3:00 p.m. Of the students attending the school only Jennifer Olin is not Amish.

The guidance counselor at the Lima Christian Academy, who holds a master of science degree in education, testified that she administered California Achievement tests in the subjects of reading, mathematics, language and spelling to Jennifer on March 31, 1978, near the end of her first year at Koppert's Korner school. Jennifer's score on the reading test was equivalent to that expected of a child in the eighth month of the fourth grade; her mathematics score was equivalent to that expected in the eighth month of the second grade; her language score was equivalent to that expected in the ninth month of the third grade; and her spelling score was equivalent to that expected in the third month of grade three. The guidance counselor further testified that only college graduates are employed as teachers at the Lima Christian Academy.

James Olin, Jennifer's father, testified in his own behalf. Olin was educated in the public schools and graduated from Ohio State University with majors in religion and economics. He is employed as a clerk in a medical office supply company in Mansfield, to which he commutes by automobile from his home in Knox County.[1] Before relocating his family residence to be near (within 1000 feet) the Koppert's Korner school, Olin lived in Green Township, Ashland County.

Olin considers himself a "born-again" or "Biblical Christian." He testified that both the social environment and curricular requirements of the public schools make sending his child to such schools inconsistent with his religious beliefs and convictions.

Olin objects to the social environment of the public schools in that he believes the conduct, beliefs, dress and actions of the people associated with the public schools are "contrary to the written word of God, the Bible." Jennifer would, in his opinion, be associating in the public schools with people, "99.99 percent" of whom frequently use television—"a mechanical device [which]***is destroying our society" and is "destructive to the home,***the nation, and to anyone who watches it." Olin further objects to the dress worn by students in the public schools, which he does not consider to be "modest apparel."[2]

Olin testified that adherence to the Ohio minimum standards requires schools to teach "things that are contrary to the Word of God" and requires students to "participate in things that I believe a Christian should not participate in." He believes that public schools teach children things that are not true,[3] and disagrees with the viewpoints from which various subjects are taught. He objects to an atmosphere of competitiveness he perceives to be pervasive in sports in the public schools, although he admits "there's nothing wrong with sports" *per se.*

Olin believes that Jennifer is the property of God, en-

---

[1] Although Olin is a resident of Knox County, his home is located within the Richland County Public School district.

[2] Olin believes it is immodest for women or girls to wear dresses above the knee or to cut their hair.

[3] For example, Olin does not believe that light travels in a straight line.

trusted to him by God, and that it is his "solemn religious duty to see to the upbringing of the child in a Christian manner."[4] It is his conviction that "as a Christian parent it would be very difficult if not impossible to raise***[Jennifer] as a Christian in the context and environment of the curriculum and the social influences of the***public school." He testified that the Koppert's Korner Amish school is the only school within a reasonable traveling distance of his home to which he could send Jennifer in accord with his religious beliefs, and that it is Biblical that Jennifer not attend a public school.

When Jennifer graduates from Koppert's Korner school after completing the eighth grade, Olin plans to continue her education at home, if possible, under the supervision of his wife and himself. However, "if she should***desire to have a more formal education beyond that point and there were facilities available***of the Christian nature***and it were within our power, we would endeavor to make them available to her."

Olin is not affiliated with any organized religious denomination. He considers himself to be a church-goer in the sense that "wherever***two or three individuals gather in whom the spirit of Jesus Christ dwells, there is the church."[5] He concedes that neither he nor his family is Amish, although he professes to share many of their beliefs. The Amish did not charge Olin tuition for Jennifer's education, but Olin has contributed money to the school in an amount commensurate with that paid by an Amish family.

Rousas Rushdoony, a minister, writer and educator, testified that, to a Biblical Christian, the Bible represents the authoritative and binding Word of God. He testified that all education is inherently religious, in that it transmits the ultimate values and standards of a culture or community. Rushdoony testified that for a school to adhere to the Ohio minimum standards requires a school to transmit the religion of humanism, shifting a child's priorities and values away from God as sovereign to man and the state as sovereign. Because the Ohio minimum standards, in his opinion, mandate the

---

[4] See Proverbs 22:6.

[5] See Matthew 18:20. Olin refers to this as the "Gathering of the Mystical Body of Jesus Christ."

teaching of humanistic values, it is alien to the faith of a "Biblical Christian" to send his child to a school in compliance with the minimum standards. He testified that a Christian commits sin in sending his children to public schools.

## I.

Appellant first contends that his conviction must be reversed on procedural grounds. His procedural objections have no merit.

At the close of the presentation of the state's case, appellant moved for judgment of acquittal pursuant to Crim. R. 29(A) on the grounds that the state had failed to establish every element of the offense charged beyond a reasonable doubt. Olin asserts that the state did not prove beyond a reasonable doubt that Jennifer was of "compulsory school age," i.e., at least six years of age. R. C. 3321.01. The state attempted to establish Jennifer's age through the testimony of Jane A. Olin, Jennifer's mother, who is also appellant's wife. However, the court dismissed Mrs. Olin as a witness on the basis of marital privilege (R. C. 2317.02[D]) and the Fifth Amendment privilege against self-incrimination before the prosecutor could elicit testimony from her as to Jennifer's age. The prosecutor made a proffer that, had Mrs. Olin been permitted to testify, she would have testified that Jennifer was of compulsory age.

The state has not cross-appealed the court's dismissal of Mrs. Olin as a witness. Therefore the propriety of that ruling is not before us. Nevertheless, the state's evidence even in the absence of her testimony was such that reasonable minds could have reached different conclusions as to whether it was proved beyond a reasonable doubt that Jennifer had reached the age of six while attending Koppert's Korner.

The Koppert's Korner school board president testified that students were not accepted at the school unless they were at least six years of age. Nothing in the state's case would lead to the conclusion that Jennifer was enrolled prematurely, and the Amish teacher testified that Jennifer was in her second year at the school at the time of trial. The attendance officer, Martin Nagle, testified that Olin stated, against his own in-

terest, that Jennifer was of compulsory school age.[6] In light of these circumstances, it was not error to fail to grant a judgment of acquittal at the close of the state's evidence. See *State* v. *Bridgeman* (1978), 55 Ohio St. 2d 261.

Olin asserts that his conviction must be reversed in that the attendance officer failed to comply with R. C. 3321.19 and 3321.20. These statutes mandate the delivery of a warning to a suspected truant child and his parent prior to filing a complaint against them. In this cause, prior to the initiation of legal proceedings, Nagle sent a written notice to Olin by regular mail warning him of Jennifer's non-attendance and the legal consequences of her alleged truancy. Olin met with public school officials prior to the initiation of legal proceedings. He appeared at trial, represented by counsel, and fully defended. No juvenile charges were brought against Jennifer. We find that Olin was fully warned prior to the filing of the complaint, and, thus, that compliance was had with R. C. 3321.19 and 3321.20.[7]

Olin asserts that the state failed to prove that his residence within Knox County was within the jurisdiction of the Richland County Attendance Officer. This contention is rebutted by the record.[8]

Similarly, the state is not required to prove that an allegedly truant child is *not* employed under an age and schooling certificate to establish a *prima facie* case of a violation of R. C. 3321.03, 3321.04 and 3321.38. This is particularly so when it is beyond a reasonable doubt that the child has not

---

[6] Olin testified during the presentation of the defense, that Jennifer was, in fact, seven years of age at that time.

[7] A written warning is a legal notice when sent by registered mail, R. C. 3321.21. A written warning need not, however, be sent by registered mail to be effective, R. C. 3321.19 and 3321.20.

[8] "Q. And were you able to ascertain where Jennifer Olin lived, lives?

"A. Yes, I did.

"Q. And where does she live?

"A. She lives in Knox County right close to an Amish school.

"Q. And what school district is that in?

"A. That is in the Clear Fork school district.

"Q. Clear Fork school district is within the Richland County Public School System?

"A. That's right."

attained the age of 16, a requisite for the valid issuance of such a certificate. R. C. 3331.01.

## II.

Olin argues that his prosecution for failure to comply with the compulsory education law constitutes unconstitutional discriminatory prosecution in violation of the Fourteenth Amendment to the United States Constitution. Olin failed, however, to satisfy his heavy burden of showing that he was intentionally or purposely discriminated against, *i.e.*, that his selection for prosecution was based upon his race, religion, exercise of constitutional rights or other impermissible consideration. *State* v. *Flynt* (1980), 63 Ohio St. 2d 132.

Olin contends that from the group of non-Amish parents sending their children to non-chartered elementary schools, only he was singled out for prosecution. We note initially that Olin made no showing that other such parents within the jurisdiction of the Richland County Attendance Officer or the Knox County prosecutor were left free from prosecution. Cf. *State* v. *Wood* (Miss. 1966), 187 So. 2d 820, 827. Assuming *arguendo* that Olin was singled out by local law enforcement officials for prosecution from the group of parents in probable violation of R. C. 3321.38, in our system of justice "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring * * * generally rests entirely in his discretion," *Bordenkircher* v. *Hayes* (1978), 434 U. S. 357, 364, unless his decision making is based upon an unjustifiable standard such as race or religion. Similarly, "* * * a claim that others violate a statute with impunity does not make out a denial of equal protection unless it is shown that there is some form of discrimination in the actual enforcement of the statute." *Rhinehart* v. *Rhay* (C. A. 9, 1971), 440 F. 2d 718, 727. It will not be presumed that a prosecutor's decision to prosecute has been invidious or in bad faith. *State* v. *Flynt, supra.*

In this cause, Olin's purpose in sending Jennifer to the Amish school was convincingly shown to be religious. Olin failed to prove, however, that the fact that he held nonconforming religious beliefs in any way motivated the *state* in *its*

decision to charge him with a violation of R. C. 3321.38 on the basis of his religiously motivated conduct. To the contrary, Olin has not rebutted the state's contention that its prosecution of Olin was based on a concern for Jennifer's welfare. Koppert's Korner school, unlike other non-chartered religious schools, is in gross disparity with the most fundamental educational protections the state's minimum standards were designed to assure.[9]

A prosecutor may consider the nature or aggravation of a violation in determining whether to prosecute. Cf. *State* v. *Walker* (Iowa 1975), 236 N.W. 2d 292.

Nor does the state's acquiescence in Amish non-compliance with state compulsory education law justify a finding that the prosecution of the non-Amish for violation of the same law is unconstitutionally discriminatory. The state concedes that Olin would not have been prosecuted had he been Amish. However, such an admission merely reflects the state's recognition that the Amish have established that members of their religious communities are excepted from the applicability of state compulsory education laws. *Wisconsin* v. *Yoder* (1972), 406 U. S. 205. Such an exemption " 'reflects nothing more than the governmental obligation of neutrality in the face of religious differences***.' " *Wisconsin* v. *Yoder, supra,* at page 235, fn. 22, and does not have the effect of favoring or advancing the Amish religion. In the same way, the state has not discriminated against Olin for being non-Amish in prosecuting him when he does not share the integrated religious beliefs and lifestyle of the Amish. In short, the fact that the state does not prosecute the Amish for violations of the compulsory education law, standing alone, is insufficient to prove the ultimate issue—whether the state's prosecution of Olin was the result of impermissible religious persecution.

### III.

Appellant's final contention is that his conviction cannot stand in light of the doctrines postulated in *Wisconsin* v.

---

[9] Compare the Tabernacle Christian School at issue in the *Whisner* case, where a full range of secular subjects was taught by a certified, college-educated teacher. *State* v. *Whisner* (1976), 47 Ohio St. 2d 181.

*Yoder, supra,* and *State* v. *Whisner* (1976), 47 Ohio St. 2d 181. He contends that the state must permit him to send his child to the Koppert's Korner Amish school as an incident of his right to freely exercise his religion, protected by the First Amendment, and his right to direct the upbringing and education of his child, as guaranteed by the Ninth and Fourteenth Amendments.

In *Wisconsin* v. *Yoder,* certain members of the Amish religion objected to the Wisconsin compulsory education law in so far as it required then to cause their children to attend school past the eighth grade.[10] They believed, in accordance with the tenets of Old Order Amish communities generally, that sending their children to high school would endanger their own salvation. High school attendance was thought to interpose a serious barrier to the integration of the Amish child into the Amish religious community. It was believed that attendance at schools past the eighth grade by highly impressionable Amish adolescents would jeopardize the continued survival of Amish communities in the United States.

In affirming the Wisconsin Supreme Court's reversal of the Amish parents' convictions, the United States Supreme Court employed a balancing test. The court weighed the concededly valid interest of the state in imposing reasonable regulations for the control and duration of basic education against the fundamental rights asserted by the Amish to freely exercise their religion and to direct their children's religious upbringing. The court concluded that the Amish parents had convincingly demonstrated the sincerity of their religious beliefs, the interrelationship of belief with their mode of life, the vital role that belief and daily conduct play in the continued survival of Amish communities, the hazards of enforcing the compulsory education law against them, and the adequacy of the informal vocational education provided Amish youth past the eighth grade. The court held that the state had failed to show how, on balance, its legitimate interests in assuring an educated, self-reliant and self-sufficient populace justified requiring Amish children to attend school for a period of up to

[10] Wisconsin law required school attendance of children until age 16. The students in *Yoder,* although graduates of an eighth grade public school, were 14 and 15 years old.

two additional years in contravention of their religious beliefs.

In *State* v. *Whisner, supra,* the parents of children attending a non-chartered school known as the Tabernacle Christian School were prosecuted and convicted of violating the Ohio compulsory education law by not sending their children to a state-approved school. We held that the Minimum Standards for Ohio Elementary Schools, compliance with which was a requisite for issuance of a state charter, were of such an extensive and comprehensive nature that forced adherence to the standards infringed those parents' rights to freely exercise their religion and to direct the religious upbringing of their children.

Pursuant to *Wisconsin* v. *Yoder* and *State* v. *Whisner,* when confronted with the contention that application of Ohio's compulsory education law violates a parent's free exercise rights we must engage in a tripartite analysis.

Our first inquiry must be whether, upon the entire record of the cause, it may be concluded that Olin's religious beliefs are "truly held."

The Court of Appeals correctly decided that the sincerity of Olin's beliefs was adequately demonstrated. The fact that his beliefs are not in total conformity with those of the Amish or any other organized religion does not make them any less religious, or his sincerity in them any less real. Olin's beliefs are rooted in the Bible and his interpretation of it; not in secular considerations. It was not contended that Olin's profession of belief was a sham or subterfuge adopted in order to avoid the obligation of sending Jennifer to a state-chartered school. Despite the delicacy of the question whether particular beliefs are "religious,"[11] the only finding justified on this record is that Olin's beliefs grow out of deep religious conviction, are truly held, and are entitled to the protection of the First and Fourteenth Amendments.

Second, we turn to the issue of whether Olin demonstrated the manner in which the minimum standards, as applied to him, infringed upon his federal right to the free exercise of religion.[12]

---

[11] *Wisconsin* v. *Yoder, supra,* at page 215.

[12] *State* v. *Whisner, supra,* paragraph one of the syllabus. Appellant has confined his claims on appeal to those based on the federal Constitution and does not seek to vindicate his independent right under Section 7, Article 1 of the Ohio Constitution.

To a large degree, Olin's objections are to what he believes to be the evils of the contemporary public school system and, indeed, to contemporary society as a whole. Olin believes he must insulate his child from worldly values and the temptations of peer pressure to which she would be exposed in public schools. However, the Ohio compulsory education law in no way requires Olin to send Jennifer to the public schools. Such an attempt would be unconstitutional. *Pierce* v. *Society of Sisters* (1925), 268 U. S. 510. Nor are many of the aspects of the public schools Olin finds objectionable attributable to the minimum standards.[13]

What the Ohio compulsory education law generally requires is that a parent see to it that his child attend a school that conforms to minimum standards prescribed by the State Board of Education. R. C. 3321.03. Compliance with those standards is evidenced by the issuance of a state charter to a school by the State Board of Education. R. C. 3301.16. Undoubtedly, many private parochial elementary schools find it possible to comply with the state's minimum standards and, at the same time, further their religious objectives.[14]

Olin contends, however, that as applied to him, the compulsory education law requires him to send Jennifer to a public school when the Amish school is the only school within a reasonable traveling distance of his home to which he could, in good conscience, send his daughter, *i.e.*, a non-public school where Jennifer would not be subjected to immoral, heretical influences.

This contention loses force in light of the totality of evidence presented. First, Olin relocated his family solely so that Jennifer would be near the Koppert's Korner school, in his estimation, an acceptable school. Second, testimony was given that a fundamentalist Christian church school, the Temple Christian School, was located in Mansfield, the city in which Olin was employed; and third, Olin testified that, if necessary, he would in the future endeavor to make more for-

---

[13] *E.g.,* that public school students watch television.

[14] Serving on the Advisory Council on Elementary School Standards whose suggestions contributed to the 1970 Ohio Minimum Elementary School Standards were the Assistant Superintendents of Catholic Schools, Youngstown and Cincinnati Dioceses, and the Superintendent of the Lutheran Schools of Ohio.

mal education available to Jennifer if Christian facilities were available.

Nevertheless, certain aspects of the minimum standards come in direct conflict with Olin's religious beliefs and interfere with the free exercise of his religion. This conflict stems in large part from the all-encompassing nature of the standards, which purport to govern virtually every aspect of the educational process. See *State* v. *Whisner, supra.* Rushdoony's testimony, with which Olin testified he was in full accord, was that the minimum standards mandate the teaching of "humanistic" values, alien to the beliefs of a Biblical Christian. The conclusion is inevitable that were Olin to send his daughter to a school in conformance with the 1970 Ohio minimum standards, he would, according to his beliefs, be subjecting himself to damnation. In so doing, the law required him "to perform acts undeniably at odds with fundamental tenets of [his] religious beliefs.***" *Wisconsin* v. *Yoder, supra,* at page 218.

Under our Constitution, however, even where an individual has demonstrated that state regulations burden his free exercise of religion, that right may be subordinate to an overriding, compelling state interest in the regulation of a subject within the state's constitutional power to regulate. *Sherbert* v. *Verner* (1963), 374 U. S. 398, 403.

Both this court and the United States Supreme Court have recognized the importance to the state of assuring that children receive quality educations, enabling them to intelligently undertake the obligations of citizenship.[15] Although

---

[15] "Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." *Brown* v. *Board of Education* (1954), 347 U. S. 483, 493.

"There is no doubt as to the power of a State, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education. See, *e.g., Pierce* v. *Society of Sisters,* 268 U. S. 510, 534, (1925).

we recognize that the state's interest in educational quality is an important one, to be characterized as "compelling," so as to overbalance legitimate claims to the free exercise of religion, the state must demonstrate that a regulatory implementation of that interest is such that the state's interest cannot otherwise be served. *State* v. *Whisner, supra,* at page 217.[16]

We held in *State* v. *Whisner* that the minimum standards then in effect "overstep the boundary of *reasonable* regulation as applied to a non-public religious school." *Id.,* at 204. Despite our holding, the State Board of Education has not adopted new standards for application to non-public schools which, while adequate to assure the provision of "a general education of a high quality," R. C. 3301.07(D), do not simultaneously suffocate "independent thought and educational policy," *State* v. *Whisner, supra,* at page 215, or abrogate parents' liberty to direct the education of their children, *Id.,* at page 218.

We believe that such a set of less-restrictive standards could be adopted. We recognize that "the courtroom is simply not the best arena for the debate of issues of educational policy and the measurement of educational quality," *State* v. *Shaver* (N.D. 1980), 294 N.W. 2d 883, 900, as well as the "obvious fact that courts are not school boards or legislatures, and are ill-equipped to determine the 'necessity' of discrete aspects of a State's program of compulsory education." *Wisconsin* v. *Yoder, supra,* at page 235. We note, however, that in *State* v.

Providing public schools ranks at the very apex of the function of a State." *Wisconsin* v. *Yoder, supra,* at page 213, quoted in part in *State* v. *Whisner, supra,* at page 198.

"The State advances two primary arguments in support of its system of compulsory education. It notes, as Thomas Jefferson pointed out early in our history, that some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence. Further, education prepares individuals to be self-reliant and self-sufficient participants in society. We accept these propositions." *Wisconsin* v. *Yoder, supra,* at page 221.

In a recent case, education was referred to as "the very foundation of our democracy." *Bd. of Edn.* v. *Walter* (1979), 58 Ohio St. 2d 368 (Locher, J., dissenting opinion at page 390).

[16] "***[W]e think it clear that a government regulation is sufficiently justified***if it furthers an important or substantial governmental interest***and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States* v. *O'Brien* (1968), 391 U.S. 367, 377.

*Whisner* we emphasized the *prima facie* reasonableness of the Ohio compulsory education enabling legislation, particulary R. C. 3301.07 which mandates that non-public schools provide a *general* education of a *high* quality. Thus, it would appear that standards may properly be devised which are designed to assure achievement by students in a wide range of subject areas. The board may be guided by the United States Supreme Court's statement in *Board of Edn.* v. *Allen* (1968), 392 U. S. 236, 245, to the effect that "***a substantial body of case law has confirmed the power of the states to insist that attendance at private schools, if it is to satisfy state compulsory-attendance laws, be at institutions which provide minimum hours of instruction, employ teachers of specified training, and cover prescribed subjects of instruction***," as quoted in *State* v. *Whisner, supra,* at page 197.

Additionally the state board might refer to the North Dakota regulatory scheme approved in *State* v. *Shaver, supra.* That scheme required the issuance of state approval of a private or parochial school upon a showing that (1) all teachers are legally certified, (2) courses are offered in a prescribed range of secular subjects, and (3) the school is in compliance with all municipal and state health, fire, and safety laws. Finally, the court recognized in *Pierce* v. *Society of Sisters, supra* (268 U. S. 510), at page 534, that the parental right to direct the religious upbringing of children is subject to the reasonable right of the state "***to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare."

In balancing an individual's right to freely exercise religious beliefs against a state's legitimate interest in assuring that its citizens receive quality educations, a court performs a sensitive and delicate task. *Wisconsin* v. *Yoder, supra,* at page 235. Our decision today, as in *State* v. *Whisner,* demonstrates simply that until such time as the State Board of Education adopts minimum standards which go no further than necessary to assure the state's legitimate interests in the

education of children in private elementary schools, the balance is weighted, *ab initio,* in favor of a First Amendment claim to religious freedom.

Accordingly, the judgment of the Court of Appeals is reversed.

*Judgment reversed.*

CELEBREZZE, C. J., W. BROWN, P. BROWN, SWEENEY, LOCHER and STILLMAN, JJ., concur.

HOLMES, J., concurs in the judgment.

STILLMAN, J., of the Eighth Appellate District, sitting for DOWD, J.