**FELLOWSHIP BAPTIST CHURCH, et al., Plaintiffs,**

v.

**Robert T. BENTON, et al., Defendants.**

**Civ. No. 81–546–C.**

United States District Court, S.D. Iowa, C.D.

Sept. 26, 1985.

**310**

Charles E. Craze and Daniel Loomis, Gibbs & Craze, Parma Heights, Ohio and Craig Hasting & Terry Hamilton, Clark, Clark & Hastings, Ames, Iowa, for plaintiffs.

Thomas J. Miller, Atty. Gen. of Iowa, Merle Fleming, Asst. Atty. Gen., and Ivan T. Webber, Keokuk, Iowa, for defendants.

## ORDER

STUART, District Judge.

This lawsuit involves the serious tensions that result when the religious freedoms guaranteed by the First Amendment to the United States Constitution appear to be in conflict with the state's compelling interest in seeing that its children are properly educated.

Plaintiffs are two churches which operate Christian schools in Marshalltown and Keokuk, Iowa, as part of their "educational ministry"; the churches' pastors; the schools' principals and several teachers; students' parents; and students of the schools. They brought this action for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983, with jurisdiction predicated on 28 U.S.C. § 1343(3) and (4). Plaintiffs challenge the constitutionality of Iowa's statutory and regulatory scheme which governs nonpublic education in the state. The broad issue is whether the requirements of Iowa's compulsory education laws impose unconstitutional burdens on the plaintiffs. "Courts must move with great circumspection in performing the sensitive and delicate task of weighing a State's legitimate social concern when faced with religious claims for exemption from generally applicable educational requirements." *Wisconsin v. Yoder*, 406 U.S. 205, 235, 92 S.Ct. 1526, 1543, 32 L.Ed.2d 15 (1972).

The plaintiff churches operate day schools through the 12th grade. They do not comply with the reporting requirements of Iowa Code § 299.3. They do not employ certified teachers, which subjects the parents of the students to prosecution for failure to comply with the compulsory attendance requirements of § 299.1. Plaintiffs state their claims as follows:

I.  Imposition of Iowa's School Regulatory Scheme Upon the Plaintiffs Violates Rights of Plaintiffs Protected By The Free Exercise Clause of the First Amendment to the Constitution of the United States and by Article I, Sections 3 and 4 of the Iowa Constitution.

II.  Imposition of the State Regulatory Scheme Upon the Churches, Pastors, Administrators, and Instructors Violates Rights Protected By The Establishment Clause of the First Amendment to the United States Constitution and By Article I, Sections 3 and 4 of the Iowa Constitution.

III.  Imposition of the State Regulatory Scheme Violates the Rights of the Parents, Instructors and Children to Express, Transmit, and Receive Ideas Contrary To the Provisions of the First, Ninth and Fourteenth Amendments to the Constitution of the United States and Article I, Sections 9 and 20 of the Constitution of the State of Iowa.

IV. The Iowa School Laws and Regulations are Vague in Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 9 of the Iowa Constitution.

V. The Reporting Required of Plaintiffs by the Iowa School Laws and Regulations Violates Rights of Plaintiffs to Freedom of Association Protected By the First and Fourteenth Amendments of the United States Constitution and Article I, Section 20 of the Iowa Constitution.

VI. The Requirement That The Plaintiff Instructors Apply for and Accept a State Teacher's Certificate When Their Faith Prohibits Them From So Doing Absolutely Infringes Their Right to Pursue Their Religious Avocation in Violation of the Due Process Rights Guaranteed Them By the Fourteenth Amendment to the United States Constitution and Article I, Section 9 of the Iowa Constitution.

VII. By the Terms of the Iowa Constitution and the Statutes Promulgated Thereunder, The State of Iowa May Not Require Certification of Private School Teachers.

VIII. Plaintiffs Have Been Denied or Are Purportedly Ineligible for the Grant of Statutory Exemptions From the Strict Application of the System of School Regulations and Controls in Violation of Their Right to Equal Protection of the Law Guaranteed By the Fourteenth Amendment to the United States Constitution.

The conflict between the free exercise of religion and government action is not new. In 1878 the Supreme Court dealt with the conflict between the Mormon Church's religious doctrine requiring the practice of polygamy and the statute prohibiting it. The Court there made the distinction between beliefs and practices that still exists:

Laws are made for the government of actions and while they cannot interfere with mere religious beliefs and opinions, they may with practices.

*Reynolds v. United States*, 8 Otto 145, 98 U.S. 145, 166, 25 L.Ed. 244 (1878). See also *Sherbert v. Verner*, 374 U.S. 398, 402–03, 83 S.Ct. 1790, 1792–93, 10 L.Ed.2d 965 (1963).

In 1922, the Court in *Meyer v. Nebraska*, 262 U.S. 390, 403, 43 S.Ct. 625, 628, 67 L.Ed. 1042 (1923), considered the government's power to control education in dealing with a Nebraska statute that prohibited the teaching of German language in schools. Although the Court recognized the "power of the State to compel attendance at some school and to make reasonable regulations for all schools," it held that the statute interfered with the individual's liberty interest and as applied "is arbitrary and without reasonable relation to any end within the competency of the state." *Ibid.*, 374 U.S., at 402–03, 83 S.Ct. at 1792–93.

In *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) the Supreme Court held that a statute requiring children between eight and sixteen who had not completed the 8th grade to attend *public* school interfered with "the liberty of parents and guardians to direct the upbringing and education of children under their control." *Ibid.* at 534, 45 S.Ct. at 573. In connection with the State's interest, the court stated:

No question is raised concerning the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught and that nothing be taught that is manifestly inimical to the public welfare.

*Ibid.* at 534, 45 S.Ct. at 573.

This Court obtains much of its guidance from *Wisconsin v. Yoder*, 406 U.S. 205, 92

S.Ct. 1526, 32 L.Ed.2d 15 (1972), in which the court dealt with the conflict between Amish religious beliefs including their inseparable mode of life and the Wisconsin laws requirementing formal education to age sixteen, even if the 8th grade had been completed. The *Yoder* court sets forth the principles to be applied in resolving the conflict between the Free Exercise Clause and a State's compelling interest.

There is no doubt as to the power of a State, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education. See, *e.g.* *Pierce v. Society of Sisters*, 268 U.S. 510, 534 [45 S.Ct. 571, 573, 69 L.Ed. 1070] (1925). Providing public schools ranks at the very apex of the function of a State. Yet even this paramount responsibility was, in *Pierce*, made to yield to the right of parents to provide an equivalent education in a privately operated system. There the Court held that Oregon's statute compelling attendance in a public school from age eight to age 16 unreasonably interfered with the interest of parents in directing the rearing of their offspring, including their education in church-operated schools. As that case suggests, the values of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society. See also *Ginsberg v. New York*, 390 U.S. 629, 639 [88 S.Ct. 1274, 1280, 20 L.Ed.2d 195] (1968); *Meyer v. Nebraska*, 262 U.S. 390 [43 S.Ct. 625, 67 L.Ed. 1042] (1923); *cf. Rowan v. Post Office Dept.*, 397 U.S. 728 [90 S.Ct. 1484, 25 L.Ed.2d 736] (1970). Thus, a State's interest in universal education, however highly we rank it, is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children so long as they, in the words of *Pierce*, "prepare [them] for ad-

ditional obligations." 268 U.S. at 535 [45 S.Ct. at 573].

It follows that in order for Wisconsin to compel school attendance beyond the eighth grade against a claim that such attendance interferes with the practice of a legitimate religious belief, it must appear either that the State does not deny the free exercise of religious belief by its requirement, or that there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause.

*Ibid.* at 213–14, 92 S.Ct. at 1532–33. The Court then stated:

The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion. We can accept it as settled therefore, that, however strong the State's interest in universal compulsory education, it is by no means absolute to the exclusion or subordination of all other interests.

*Ibid.* at 215, 92 S.Ct. at 1533.

Under the teachings of *Yoder*, this Court must first determine the quality of plaintiffs' claims concerning the alleged encroachment of Iowa's compulsory attendance requirements on their right to the free exercise of their religious beliefs. A determination of what is a religious belief or practice entitled to constitutional protection "may present a most delicate question." *Yoder* at 215, 92 S.Ct. at 1533. However, "the very concept of ordered liberty precludes allowing every person to make his own standards on the matters of conduct in which society has important interests. Thus [if plaintiffs] asserted their claims because of their subjective evaluation and rejection of the contemporary secular values accepted by a majority * * *, their claims would not rest on a religious basis." *Yoder* at 216, 92 S.Ct. at 1533.

However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question: religious beliefs need not be

acceptable, logical, consistent or comprehensible to others in order to merit First Amendment Protection.

*Thomas v. Review Board,* 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981).

If the Court determines that fundamental claims of religious freedoms are at stake, the court must searchingly examine the interests that the State seeks to promote and the impediment to those objectives that would flow from recognizing the claimed religious beliefs and practices. *Yoder,* 406 U.S., at 221, 92 S.Ct. at 1536.

With these authorities and principles in mind the Court will examine the plaintiffs' claims of violations of the Free Exercise Clause of the First Amendment by the State compulsory education laws and regulations.

## REPORTS FROM PRIVATE SCHOOLS

Section 299.3, Code of Iowa requires the principal of any private school in Iowa, upon request from the secretary of the school district in which the school is located, to furnish the "names, ages and number of days attendance of each pupil ... over seven and under sixteen years of age, the course of study pursued by each such child, the texts used, and the names of the teachers" during the preceding year.

The plaintiff churches, pastors, teachers and administrators allege that the reporting requirement violates their religious belief in the "Headship of Christ" over the church since the church and church schools are inseparable. They also allege that the reporting requirements result in entanglements between the church and state that violate long-held, historic Baptist doctrine of separation of church and state. The parents and children have no religious objection to being required to make such report individually or by a parent representing all parents.

■ Clearly, the "Headship of Christ" is a sincerely held religious conviction of these plaintiffs. However, the Court has had considerable difficulty in under-

standing how the reporting requirement denies the free exercise of that religious belief. As the Court understands plaintiffs argument, they claim that by complying with the state's request for that information, they are acknowledging the State's headship over Christ or a dual headship of the Church. The Court cannot accept this argument. There is no evidence that the reporting of the requested information violates any other proclaimed sincerely held religious belief. The report is informational only and in no way attempts to influence or control the operation of the school or any other church activity. The Court finds that the reporting requirement does not deny the plaintiffs the free exercise of their religion.

Even if it is assumed the reporting requirement does impinge upon plaintiffs' free exercise of religion, the states interest in knowing whether its children are attending school and receiving an adequate education is of sufficient magnitude to override the plaintiffs' religious interest in an exemption from the reporting requirements. This is necessarily so because without the information to be included in the reports, the State would be greatly impeded, if not totally precluded, from insuring that its children are receiving an adequate education. Reports submitted by individual parents or an elected representative would not provide a means by which the information could be verified and there is no guarantee all present or future parents would agree to such proceedings. Thus, a substantial impediment to the State's objective would still result. Section 299.3 places the responsibility for reporting on the principal and does not unconstitutionally impinge upon the plaintiffs' right to free exercise of religion.

"Judicial caveats against entanglement must recognize that the line of separation, far from being a 'wall' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971). The relationship between the State

and the churches, pastors and administrators created by the reporting requirement is not excessive. State requirements under the compulsory school attendance laws are necessary and permissible contacts. *Lemon* at 614, 91 S.Ct. at 2112.

The information requested is readily available at the school and would not be a burden on the school's limited staff. Evidence has been presented that in private schools, with larger enrollments than either of the plaintiff schools, the completion of the required report takes from a half hour to a half day and can be done by the secretary with the principal being ultimately responsible. This is all that is required of the plaintiff principals by section 299.3. These requirements do not unconstitutionally impinge upon the plaintiffs right to free exercise of religion or result in an unconstitutional entanglement between the church and state.

## CERTIFIED TEACHERS

Although plaintiffs suggest that there may be some uncertainty as to the meaning "certified teacher" and that perhaps the legislature meant "competent teacher", such argument is without merit. The legislature amended the statutes to change the requirement from "competent" to "certified" in 1953. Thus changing the requirement from a subjective factual evaluation to an easily identifiable objective standard. Certified teacher in § 299.1 means a teacher with a certificate issued in accordance with Chapter 260 Code of Iowa and the applicable rules and regulations. Accordingly the term "certified teacher" is not unconstitutionally vague. *State v. Moorhead*, 308 N.W.2d 60, 64 (Iowa, 1981).

To obtain a certificate to teach in Iowa, an applicant must be a graduate of either an Iowa institution approved by the state board of public instruction or a non-Iowa institution accredited by the regional accrediting agency which meets certain other criteria. Iowa Administrative Rules, Public Instruction Department 670–13.1, 670–13.10 and 670–13.11. A procedure is provided by which a graduate from a non-recognized institution may take certain courses to validate the degree and obtain a certificate.

Teachers in these two schools are not certified and do not have degrees from recognized institutions. Some possess baccalaureate degrees, others while not possessing a degree have had some formal post high school education. Still others have no formal post high school education.

Plaintiffs raise the following constitutional objections to the certificate requirement.

1. The State's human relations requirements for teacher education leading to certification are contrary to sincerely held religious beliefs of the churches and their members.

2. Supervision of certified teachers by the Iowa Professional Teaching Practices Commission violates the Free Exercise Clause of the First Amendment by allowing the State to intrude upon the churches practices, policies and beliefs.

3. The teachers are religious teachers called by God to teach in these Christian schools and it would be violative of their religious beliefs to seek state certification or approval before they could do God's will. Thus the certification requirement would violate their belief in the Headship of Christ.

The State requires recognized institutions to include a human relations component in their programs leading to teacher certification to "contribute to the development of sensitivity to and understanding of the values, beliefs, lifestyles and attitudes of individuals and the diverse groups found in a pluralistic society." 670–13.18(257) Standards for approved components are set out in 670–13.21.[1]

---

1. 670–13.21(257) Standards for approved components. Human relations components will be approved by the state board of public instruction upon submission of evidence that they are designed to develop the ability of participants to:

Plaintiffs do not object to children or teachers being made aware of current events, or diverse view points, values and attitudes, but object to them being taught from other than a Biblically-based philosophy. They believe these matters should be submitted to rigorous scrutiny from a Biblical philosophical base and method of reasoning. Their principal objection was the reference to "sexism" as a "dehumanizing bias" in view of their sincerely held religious beliefs that God provided different roles for the male and female; that the man is the head of the household and must love his wife as Christ loves the church and that the wife must obey her husband. The only other specific matter raised was the question of homosexuality and whether teachers seeking certification would be required to view and or teach homosexuality as an acceptable alternative lifestyle. There appeared to be no problem with racism, prejudice or discrimination.

■ The Court does not find anything in the State requirements that requires agreement with or acceptance of the values of other societal groups or individuals. There is nothing that suggests a person should abandon his own beliefs and set of values. The president of one of the Bible Colleges approved by plaintiffs indicated his students were made aware of and discussed other viewpoints and values. He indicated that the best way to test one's faith and beliefs was to compare them with other viewpoints and values. Although the State could not permit the human relations component to be taught from a Biblical point of view, the prospective teacher is not prevented from evaluating them from a Biblical base as long as he or she is aware of and understands the diversity. The Court is of the opinion that the requirement for a human relations component in a teacher's education does not deny the plaintiffs the free exercise of their religion relating to their beliefs in the different Biblical roles of the sexes.

■ The plaintiffs believe that the church and the education of the children are inseparable and that the parents have the responsibility for the religious upbringing and education of their children. They believe that each person is called to his life's work by God and that a person would be sinning if he or she disobeyed God and did not do God's will by pursuing the work to which he or she has been called. They therefore not only object to certification because of the human relation component but also because it violates the sincerely held religious belief in the headship of Christ and the long-held Baptist doctrine of separation of church and state.

In this area the Court believes there is a definite encounter between the sincerely-held religious beliefs of these plaintiffs and the State's requirements. The State's interest in this matter, the education of its children is "perhaps the most important function of state and local governments." [2] As it appears to the Court that the certifi-

---

13.21(1) Be aware of and understand the various values, life styles, history, and contributions of various identifiable subgroups in our society.

13.21(2) Recognize and deal with dehumanizing biases such as sexism, racism, prejudice, and discrimination, and become aware of the impact that such biases have on interpersonal relations.

13.21(3) Translate knowledge of human relations into attitudes, skills, and techniques which will result in favorable learning experiences for students.

13.21(4) Recognize the ways in which dehumanizing biases may be reflected in instructional materials.

13.21(5) Respect human diversity and the rights of each individual.

13.21(6) Relate effectively to other individuals and various subgroups other than one's own.

2. "Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Brown v. Board of Education,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954).

cation requirement does deny the free exercise of plaintiffs' religious beliefs, the state must show that the State's interest in the certification requirement overrides plaintiffs' interest claiming protection under the Free Exercise Clause. *Yoder,* 406 U.S., at 215, 92 S.Ct. at 1533.

Evidence was introduced showing that there are no scientific studies indicating that a teaching certificate did or did not make better teachers. There was also evidence that some colleges graduate incompetent persons who, because of the degree, are eligible for a certificate and that an examination should be required for teacher certification. Anecdotal evidence was submitted showing some untrained persons had become excellent teachers.

All of this may be accepted as true, but it misses the point. The question is how important is the certification requirement to the state's interest in seeing its children receive the kind of education demanded by today's society. The importance lies, not in the piece of paper itself, but in the education a person must receive to become eligible for the certificate. Courses in child psychology, how children learn, various methods of conveying information and developing the learning process and knowledge of the subject matter will prepare a person to be a better teacher. Recognized institutions offer the courses of this nature that Iowa requires for certification. Graduates of other schools can satisfy certain educational requirements and qualify for a certificate. This kind of knowledge is essential if one is to become a good teacher.

The certificate is no guarantee that everyone who holds one is a competent teacher. It does guarantee that the holder has been exposed to the knowledge that a competent teacher should have. The substitution by the legislature of "certified teacher" for "competent teacher" supplies an objective, easily identifiable requirement indicating that the teacher should know how to teach.

Plaintiffs object because the certificate requirement relies upon the process (education of the teacher) rather than the product (Is the child learning?). Historically, the emphasis has been on the process. Iowa has required some sort of certificate since 1863. It has been assumed that if the process is followed the children will learn. Recently there has been more interest in attempting to determine if the children are learning. Plaintiffs suggest that standardized testing of the pupils be substituted for both the certification and "equivalent education" requirements as a least drastic means. While testing is a valuable tool, it is not sufficient in and of itself to determine whether a student is receiving an adequate education. Tests primarily determine knowledge of content of the subject matter. They do not test other aspects of education necessary to prepare a student for life in today's society.

The Iowa Supreme Court dealt with the use of testing to satisfy the State's interest in the proper education of its children and decided that mere testing would be wholly inadequate to protect the State's rightful interest. *Johnson v. Charles City Community School Board,* 368 N.W.2d 74, 81 (Iowa 1985). This Court agrees with that decision for the reasons given therein.

While certification may not be infallible and does not assure us that every teacher is a good teacher, it appears to be the best method now available to satisfy the state's prime interest in seeing that its children are taught by capable persons.

The following cases have approved of the certification requirement. *Sheridan Road Baptist Church v. Department of Education,* 132 Mich.App. 1, 348 N.W.2d 263, 270–74 (1984); *State v. Rivinius,* 328 N.W.2d 220, 229 (N.D.1982) *cert. denied,* 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983); and *State v. Faith Baptist Church,* 207 Neb. 802, 301 N.W.2d 571, 579 (1981) *appeal dismissed* 454 U.S. 803, 102 S.Ct. 75, 70 L.Ed.2d 72.

In this instance the Court believes that the State has shown its interest in certification to be of sufficient magnitude to override the plaintiffs interest claiming First Amendment protection.

## EQUIVALENT EDUCATION

Plaintiffs claim that the term "equivalent education" is unconstitutionally vague on its face in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. No other statute defines equivalent instruction. The term was used, but not defined, by the Supreme Court in *Yoder. Ibid.* 406 U.S., at 213, 92 S.Ct. at 1532.

In *State v. Moorhead,* 308 N.W.2d 60 (Iowa 1981) the Iowa Supreme Court rejected such claim saying:

> The term "equivalent" is defined to mean "equal in force or amount ...: like in signification or import ...: equal in value." Webster's Third New International Dictionary 769 (unabridged 1966). A fair reading of section 299.1 indicates that the term "equivalent instruction" refers back to the use of "public school" in paragraph one. Thus, "equivalent instruction" is instruction which is equal in kind and amount to that provided in the public schools.
>
> Section 257.25, The Code, establishes detailed curriculum requirements for public and nonpublic schools. This provision establishes reasonable guidelines for determining the meaning of "equivalent instruction."

*Ibid.* at 64.

■ A statute may be saved from a vagueness challenge by an interpretation by a state appellate court. *Colten v. Kentucky,* 407 U.S. 104, 111, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972). However, the same Iowa Supreme Court in *Johnson v. Charles City Community School Board,* 368 N.W.2d 74 (Iowa 1985) declined to do so as to section 257.25 and the term "equivalent instruction" as it applies to private religious schools saying:

> In *Moorhead,* we said the term means "instruction which is equal in kind and amount to that provided in public schools." *Id.* We however did not suggest that private religious schools can be made to submit to the sort of state regulation condemned in [State v.] *Whisner*

[47 Ohio St.2d 181, 351 N.E.2d 750 (1976)].

For reasons of their own the plaintiffs did not appeal on grounds of vagueness. This issue was litigated and decided by the trial court but it was not made an issue on appeal. We mention this because of the unusual and unsatisfactory posture of certain crucial aspects of this controversy. Before the school can be required to submit to reasonable minimum regulations it is obvious the state is bound to place private schools on notice of the nature and extent of the necessary minimum standards. Our holding in *Moorhead* is not authority to the contrary. Moorhead sought to educate his children by himself, without the aid of any school. No first amendment rights were claimed. Our *Moorhead* decision is not in point for persons who seek to operate a religious school for their own and other people's children.

When the state fails to adequately set necessary minimum standards for private religious schools, the patrons are presented with a ready defense to truancy charges. *State ex rel. Nagle v. Olin,* 18 O.O.3d 503, 511, 64 Ohio St.2d 341, 354–55, 415 N.E.2d 279, 288 (Ohio 1980) ("[U]ntil such time as the State Board of Education adopts minimum standards which go no further than necessary to assure the state's legitimate interests in the education of children in private elementary schools, the balance is weighted, *ab initio,* in favor of a First Amendment claim to religious freedom."); *State v. La Barge,* 134 Vt. 276, 357 A.2d 121, 125 (1976) (There is a special duty given the state department of education to define equivalent education under its regulatory authority, failing which, a prosecution should be dismissed.)

The trial court attempted with considerable effort and skill to supply standards by sorting through various school related statutes and ferreting out minimum statutory requirements. The state, which did not cross-appeal, is not altogether satisfied with the standards thus set and now invites us to refine and

318

expand the trial court's efforts. We decline.

*Ibid.* at 79–80.

Evidence on the meaning of equivalent instruction was conflicting. The State Superintendent interpreted it to be limited to a minimum number of days and the required courses listed in § 257.25(3) and career education § 280.9 without any inquiry into the content of those courses. The superintendents of schools of two school districts indicated they would inquire much more intrusively into the curriculum before making a recommendation to the local school board, which has the responsibility of determining whether the student is obtaining an equivalent education.

The problem, of course, is, how far can a state intrude into the curriculum of a private religious school to satisfy its interest without being outweighed by the impingement of such intrusion upon the free exercise of religion and the right of parents to direct the upbringing and education of their children. *Johnson v. Charles City, supra* at 78–80; *State v. Whisner,* 47 Ohio St.2d 181, 211–12, 351 N.E.2d 750, 768 (1976).

The Court could accept the least intrusive version of equivalent instruction and hold those requirements constitutional, but there is no indication that is what the legislature intended. Such limitation would do little to help the state in determining whether the student is receiving an equivalent instruction. It would open the door to a flood of law suits as to whether it was being constitutionally applied to the particular plaintiffs as every local school board could come up with a different interpretation and intrusion.

This Court agrees with the Iowa Supreme Court when it said:

A court is without either the resources or expertise necessary to draft such a regulation. *See Wisconsin v. Yoder,* 406 U.S. at 235, 92 S.Ct. at 1543, 32 L.Ed.2d at 36. ("Courts are not school boards or legislatures, and are ill-equipped to determine the 'necessity' of discrete aspects of a State's program of compulsory education."); *State ex rel. Nagle v. Olin,* 18 O.O.3d at 510, 64 Ohio St.2d at 353, 415 N.E.2d at 288, ("the courtroom is simply not the best arena for the debate of issues of educational policy and measurement of educational quality.") (quoting *State v. Shaver,* 294 N.W.2d 883, 900 (N.D.1980)).

This is especially true when the State's interest in educating its children collides with First Amendment Right of Free Exercise.

Moreover, the Court finds, in light of the varying interpretations offered by State and County officials charged with assessing compliance with the law, that the term "equivalent instruction" fails to give adequate notice to the ordinary man of what is prohibited by the statute. *See Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972).

■ Therefore, the Court therefore holds that the term "equivalent instruction" is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and may not be used as a compulsory education requirement without further definition.

The Court cannot leave this issue without pointing out other troubling matters. There may be problems when the responsibility of determining equivalent education is placed on local school boards even when it is more closely defined for two reasons. First each local school board may still have a different interpretation. Second, local school boards have an inherent conflict of interest since each student in a private school is potentially a source of additional state aid. Some other procedure might eliminate future litigation.

AMISH EXEMPTION

■ Plaintiffs claim that they have been denied equal protection under the Fourteenth Amendment to the United States Constitution because they were denied the exemption from school standards contained in § 299.24 Code of Iowa, which provides:

299.24. Religious groups excepted from school standards

When members or representatives of a local congregation of a recognized church or religious denomination established for ten years or more within the state of Iowa prior to July 1, 1967, which professes principles or tenets that differ substantially from the objectives, goals, and philosophy of education embodied in standards set forth in section 257.25, and rules adopted in implementation thereof, file with the state superintendent of public instruction proof of the existence of such conflicting tenets or principles, together with a list of the names, ages, and post-office addresses of all persons of compulsory school age desiring to be exempted from the compulsory education law and the educational standards law, whose parents or guardians are members of the congregation or religious denomination, the state superintendent, subject to the approval of the state board of public instruction, may exempt the members of the congregation or religious denomination from compliance with any or all requirements of the compulsory education law and the educational standards law . . . .

This exemption has been granted only to Amish schools and one conservative Mennonite school, all of which follow the style of life discussed fully by the Supreme Court in *Yoder* which is an integral part of their religion.

The Independent Baptist Churches grew out of the same Anabaptist religious philosophy as the Amish and Mennonites. They consider themselves "in the world but not of the world." They do not accept many of the worldly ways. Their social life, as well as their religious life, is centered in the church. However, the members live and work in the modern communities. They engage in the ordinary occupations to which they have been called. They own radios, televisions, motor vehicles and accept and use other modern conveniences and advancements. They dress conservatively, but not distinctly.

In *Yoder*, the Supreme Court made it very clear that it was the Amish separateness from contemporary society for over 300 years that led the Court to the holding that the "First and Fourteenth Amendments prevent the State from compelling respondents to cause their children to attend formal high school to age 16." *Yoder*, 406 U.S., at 234, 92 S.Ct. at 1542. The *Yoder* court recognized:

It is one thing to say that compulsory education for a year or two beyond the eighth grade may be necessary when the goal is preparation of the child for life as the majority live, but it is quite another if the goal of education be viewed as the preparation of the child for life in the separated agrarian community that is the keystone of the Amish faith.

*Yoder* at 222, 92 S.Ct. at 1536.

The Iowa Supreme Court dealt with the same issues under almost identical facts in *Johnson v. Charles City Community School Board*, 368 N.W.2d 74, 83–85 (Iowa 1985). The Court agrees with the reasoning of the Iowa Supreme Court in *Johnson* and adopts its holding.

The Court is also conscious of the impact that granting these plaintiffs an exception to the compulsory education requirements could have on public education and the courts. Under *Yoder* and *Johnson* a clear line of demarcation is established that offers guidance to parents, school officials and the courts. A blurring of that line by granting an exception here would create an impossible burden upon all persons and agencies involved to decide whether minor variations of fact one way or the other entitled each individual church school to an exception. The Court is convinced that the Supreme Court intended the exception to be a narrow one.

The Court must not ignore the danger that an exception from a general obligation of citizenship on religious grounds may run afoul of the Establishment Clause, but that danger cannot be allowed to prevent any exception no matter

how vital it may be to the protection of values promoted by the right of free exercise.

*Yoder*, 406 U.S., at 220–21, 92 S.Ct. at 1535–36.

In *Yoder* the court found that "compulsory school attendance to age 16 for Amish children carries with it a very real threat of undermining the Amish community and religious practices as they exist today." *Yoder* 406 U.S. at 218, 92 S.Ct. at 1534. No such threat faces the plaintiffs from Iowa's compulsory education requirements. The Court holds that failure to include these plaintiffs within the Amish exception does not violate the Free Exercise Clause of the First Amendment or the Equal Protection Clause of the Fourteenth Amendment.

## IOWA CONSTITUTIONAL PROVISIONS

Plaintiffs argue that the Iowa Constitutional provisions are more specific and provide more protection for the free exercise of religion than the United States Constitution. The Court has examined sections 3, 4 and 9 of Article I and sections 8, 12 and 2nd sections 1–6 of the Education Article. The Court finds that the more specific language is not related to the issues before this Court. The Court is also convinced by the position the Iowa Supreme Court took in *Johnson v. Charles City Community School Board,* 368 N.W.2d 74, that it would hold that the protection afforded the free exercise of religion by the Iowa Constitution is the same as that given by the United States Constitution. The Court holds that the compulsory education requirements of the Iowa statutes and the Amish exception do not violate any provisions of the Iowa Constitution.

The Court holds that other constitutional issues raised by plaintiffs, but not treated hereinabove are without merit.

IT IS THEREFORE ORDERED that the Clerk of Court shall enter judgment in favor of the defendants and against the plaintiffs for the costs of this case.